UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EAST FISHKILL FIRE DISTRICT,

                Plaintiff,

    v.

FERRARA FIRE APPARATUS, INC.,

                Defendant.

---

FERRARA FIRE APPARATUS, INC,

            Third-Party Plaintiff,

    v.

NEVILLE APPARATUS CORP.,

           Third-Party Defendant.

---

No. 20-CV-576 (KMK)

OPINION & ORDER

Appearances:

Christina A Mazzarella, Esq.
David R. Wise, Esq.
Mackey Butts & Whalen, LLP
Millbrook, NY
*Counsel for Plaintiff*

Anthony J. Colucci, III, Esq.
Marybeth P. Mantharam, Esq.
Ethan Notarius, Esq.
Colucci & Gallaher, P.C.
Buffalo, NY
*Counsel for Defendant*

Andrew L. Richards, Esq.
Andrew G. Kao, Esq.
Kaufman Dolowich & Voluck LLP
Woodbury, NY

*Counsel for Third-Party Defendant*

Adam A. Perlin, Esq.
McDermott, Will & Emery, LLP
New York, NY
*Counsel for Third-Party Defendant*

Matthew J. Minero, Esq.
Bartlett LLP
Central Islip, NY
*Counsel for Third-Party Defendant*

KENNETH M. KARAS, District Judge:

East Fishkill Fire District ("Plaintiff" or "EFFD") brings this Action against

Ferrara Fire Apparatus, Inc. ("Defendant" or "Ferrara") for redhibition, breach of contract, and

unjust enrichment.  (*See generally* Am. Compl. (Dkt. No. 10).)  Defendant brought a third-party

complaint against Neville Apparatus Corp. ("Neville") for breach of contract, contribution, and

indemnification.  (*See generally* Am. Third-Party Compl. (Dkt. No. 72).)  Neville brought

counterclaims against Defendant for contribution and indemnification.  (*See generally*

Counterclaim (Dkt. No. 77).)  Before the Court are Plaintiff's, Defendant's, and Neville's

Motions for Summary Judgment.  (*See* Dkt. Nos. 110, 111, 121.)  Plaintiff and Defendant

additionally moved to exclude each other's expert witnesses.  (*See* Dkt. Nos. 105, 111.)

For the reasons stated herein, Plaintiff's Motion for Summary Judgment is denied,

Defendant's Motion for Summary Judgment is granted in part and denied in part, and Neville's

Motion for Summary Judgment is denied.

I.  Background

A.  Factual Background

The following facts are taken from Plaintiff's, Defendant's, and Neville's statements

pursuant to Local Civil Rule 56.1, specifically:

- Defendant's 56.1 Statement in Support of its Motion (Defendant's Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 112));

- Plaintiff's 56.1 Statement in Support of its Motion (Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1") (Dkt. No. 116));

- Neville's 56.1 Statement in Support of its Motion (Neville's Rule 56.1 Statement ("Neville's 56.1") (Dkt. No. 122));

- Defendant's Response to Plaintiff's 56.1 Statement (Defendant's Resp. to the Rule 56.1 Statement of Plaintiff ("Def.'s Resp. to Pl.'s 56.1") (Dkt. No. 128));

- Defendant's Response to Neville's 56.1 Statement (Defendant's Resp. to the Rule 56.1 Statement of Neville ("Def.'s Resp. to Neville's 56.1") (Dkt. No. 131));

- Plaintiff's Response to Defendant's 56.1 Statement (Plaintiff's Resp. to the Rule 56.1 Statement of Defendant ("Pl.'s Resp. to Def.'s 56.1") (Dkt. No. 136)); and,

- Neville's Response to Defendant's 56.1 Statement (Neville's Resp. to the Rule 56.1 Statement of Defendant ("Neville's Resp. to Def.'s 56.1") (Dkt. No. 139)).

Additionally, where appropriate, the Court cites directly to the admissible evidence submitted by

the Parties.  The facts as described below are in dispute to the extent indicated.[1]

---

[1] The Court notes that Plaintiff improperly relies on allegations in the Amended Complaint to support the facts asserted in its 56.1 statement.  (*See* Pl.'s 56.1.)  "These facts are an improper attempt to convert allegations from Plaintiff's unverified complaint into evidence." *Lax v. City Univ. of New York*, No. 16-CV-799, 2020 WL 6161253, at *1 n.1 (E.D.N.Y. Oct. 21, 2020), *aff'd*, No. 20- CV-3906, 2022 WL 103315 (2d Cir. Jan. 11, 2022).  Local Rule 56.1(d) provides that: "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible."  Loc. Civ. R. 56.1(d).  "It is blackletter law that an unverified complaint is not evidence that can be relied upon at summary judgment." *Caro*

Plaintiff is a full-service fire department located in Hopewell Junction, New York.  (Pl.'s Resp. to Def.'s 56.1 ¶ 1; Neville's Resp. to Def.'s 56.1 ¶ 1.)  Ferrara is a manufacturer of fire apparatus and Neville is a seller of fire apparatus.  (Pl.'s Resp. to Def.'s 56.1 ¶ 2; Neville's Resp. to Def.'s 56.1 ¶ 2.)  Plaintiff purchased a Rear Mount Platform Ladder Truck with serial number 1F9508135EH140084 (the "Fire Truck" or "Truck") manufactured by Ferrara, through its dealer, Neville.  (Pl.'s Resp. to Def.'s 56.1 ¶ 3; Neville's Resp. to Def.'s 56.1 ¶ 3.)

The relationship between Ferrara and Neville began around 2001.  (Neville's Resp. to Def.'s 56.1 ¶ 1.1.)[2]  From approximately 2001 through 2020, Neville served as the exclusive dealer for Ferrara fire apparatus for Long Island and Downstate New York.  (Def.'s Resp. to Neville 56.1 ¶ 2.)  Ferrara and Neville entered into annual dealer agreements that authorized Neville to sell and promote Ferrara's products in certain territories.  (Neville's Resp. to Def.'s 56.1 ¶ 2.1.)  Ferrara and Neville executed the 2014 Dealer Agreement ("Dealer Agreement") on May 30, 2014, and the effective period was January 1, 2014 through December 31, 2014.  (*Id.*

_____

*Cap., LLC v. Koch,* — F. Supp. 3d —, 2023 WL 1103668, at *16 (S.D.N.Y. Jan. 30, 2023); *see also Bentivegna v. People's United Bank,* No. 14-CV-599, 2017 WL 3394601, at *13 (E.D.N.Y. Aug. 7, 2017) ("[A]n unverified complaint is not admissible evidence."); *Continental Ins. Co. v. Atlantic Cas. Ins. Co.,* No, 07-CV-3635, 2009 WL 1564144, at *1 n.l (S.D.N.Y. Jun. 4, 2009) (finding that on a motion for summary judgment "allegations in an unverified complaint cannot be considered as evidence." (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995))).  The Court has therefore disregarded these unsupported assertions.  Plaintiff argues that its Amended Complaint constitutes admissible evidence because "at this stage of the proceedings, it is not to be determined what is admissible evidence and what is inadmissible evidence," and that it is not the Court's responsibility to weigh the evidence but only to determine whether there is a genuine issue for trial.  (Pl.'s Reply Mem. 1–2.)  Plaintiff fundamentally misunderstands the Court's role at summary judgment.  "When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial."  *Walker v. Carrozzo,* — F. Supp. 3d —, 2023 WL 2664610, at *4 (S.D.N.Y. Mar. 28, 2023).

[2] Defendant's 56.1 statement numbers the first five statements as one through five and then begins numbering again at one.  (*See* Def.'s 56.1.)  This Court will refer to the statements following the first five as Neville has: statement number one that follows statement number five will be labeled 1.1, statement two, which is technically the seventh statement will be labeled 2.1, etc.

¶ 3.1.)  The Dealer Agreement provides that Neville shall "[a]ctively represent and promote the sales of [Ferrara's] apparatus in [Neville's] territory and maintain good customer rapport."  (*Id*. ¶ 4.1 (emphasis omitted).)  All employees at Neville, including John Heidrich ("Heidrich"), Neville's salesperson, were responsible for maintaining "good customer rapport" in 2014, as set forth in the Dealer Agreement.  (*Id*. ¶ 5.1.)  The Dealer Agreement further provides that Neville shall "agree to abide by the policies and procedures as established in [Ferrara's] Dealer Handbook, which shall be construed as part of the Dealer Agreement."  (*Id*. ¶ 6.1.)  Heidrich testified that he read Ferrara's Dealer Handbook.  (*Id*. ¶ 7.1.)  The Dealer Agreement provides that it "shall be governed, construed, and enforced in accordance with the laws of the State of Louisiana, without regard to its conflict of laws rules."  (*Id*. ¶ 9.1.)  The Dealer Agreement also contains two indemnification provisions:

> [Ferrara] agrees to indemnify, defend and hold-harmless [Neville] from any loss or claim including defense cost arising out or in any way connected with any Injury to person or damage to property resulting from the alleged negligence, strict liability, design defect, failure to warn, breach of implied warranty or any other theory, with respect to the [Ferrara]'s Products, provided the [Neville] gives [Ferrara] notice as soon as practical of any such loss or claim and cooperates fully with [Ferrara] in the handling thereof.

> [Neville] agrees to indemnify, defend and hold-harmless [Ferrara] from any loss or claim including defense cost arising out of the negligence of [Neville], [Neville's] agents, employees or representatives in the installation or servicing of [Ferrara's] Products or arising out of express warranty made by [Neville], its agents, employees or representatives with respect to [Ferrara's] Products that exceeds [Ferrara's] limited warranty.

(*Id*. ¶ 10.1; Def.'s 56.1 Ex. G (Dkt. No. 112-7).)  The Dealer Agreement provides that Neville was to procure and maintain Commercial General Liability insurance on an occurrence basis with limits of no less than $1,000,000 per occurrence, as well as Umbrella/Excess Liability with limits of liability no less than $1,000,000 per occurrence, and was to provide Ferrara with an

annual certificate of insurance.  (Neville's Resp. to Def.'s 56.1 ¶ 11.1.)  The Dealer Agreement states:

> The Distributor must procure and maintain Commercial General Liability Insurance on an occurrence basis with limits of liability of no less than $1,000,000 per occurrence combined single limit for personal injury, bodily injury and property damage. Coverage shall include premises liability, products/completed operations, independent contractors, blanket contractual and name Manufacturer as an additional insured.  The coverage afforded under this provision shall be primary to any valid and collectible insurance carried separately by the manufacturer. The Manufacturer's General Liability insurance policy will be considered excess of the Distributor's General Liability policy.  The Distributor will provide an endorsement evidencing that its policy will be primary to Manufacturer's policies for claims which the Distributor owes the Manufacturer an indemnity obligation as set out in this agreement.

> The Distributor must procure and maintain during the life of this contract Automobile/Garage Liability Insurance with limits of liability of no less than $1,000,000 per occurrence combined single limit for bodily injury and property damage.  Coverage shall include all owned vehicles, Manufacturer provided demo vehicles, all hired and non-owned vehicles and contractual liability.

> The Distributor must provide adequate physical damage coverage for customer purchased of Manufacturer provided demo apparatus while in the care, custody and control of the Distributor, including transit coverage.  Distributor shall name the Manufacturer as Loss Payee for such Manufacturer owned apparatus.

> The Distributor must procure and maintain Umbrella/Excess Liability with limits of liability of no less than $1,000,000 per occurrence/aggregate combined single limit providing excess of the Commercial General Liability, Automobile/Garage Liability policies.  This policy should be following form for all coverage provided in the underlying policies.

> The Distributor must procure and maintain Worker's Compensation Insurance with employers liability limits of no less than $500,000.

> It is required of both parties than an annual certificate of insurance shall be provided within five (5) days prior to the expiration of any coverage previously cited.  All insurance coverage shall be procured from an Insurance company with a financial rating of A- or better from A.M. Best or similar rating agency.  In the event of cancellation, each party agrees to have all their insurance policies endorsed to provide a minimum of sixty (60) days written notice of cancellation or non-renewal to the other party.  These insurance requirements shall continue for a period of five (5) years following the termination of this agreement.

(Def.'s 56.1 Ex. G.)

Neville claims that it "procured and maintained a commercial general liability policy, automobile and garage liability insurance, umbrella excess liability insurance, and workers' compensation insurance" from Travelers Indemnity Company, Travelers Property Casualty Company of America ("Travelers"), citing to an affidavit.  (Neville's 56.1 ¶¶ 8, 10.)  Ferrara responds that "[t]here is no evidence of this in the record.  Neville has not produced any of the insurance policies that it allegedly procured and maintained pursuant to the Dealer Agreements, nor any certificates of insurance.  They were not attached to Radecki's Affidavit or produced in response to Ferrara's Request for Production (despite being requested)."  (Def.'s Resp. to Neville's 56.1 ¶¶ 8, 10.)  Attached to Radecki's Affidavit is a letter from Neville's insurance carrier stating that there is no coverage afforded to Neville in connection with Plaintiff's or Ferrara's claims because "[f]or coverage to be triggered, there must be 'bodily injury' or 'property damage' caused by an 'accident' and resulting from 'garage operations.'"  (*See* Radecki Affidavit ¶ 13 (Dkt. No. 125); Radecki Affidavit Ex. N (Dkt. No. 125-3).)

In April 2012, Neville began discussions with Plaintiff regarding Plaintiff's need for a new fire apparatus when their representatives met at a trade show in Indianapolis.  (Pl.'s Resp. to Def.'s 56.1 ¶ 13.1; Neville's Resp. to Def.'s 56.1 ¶ 13.1.)  On February 12, 2013, Plaintiff issued an official Notice to Bidders for a "custom heavy duty 100' rear mount platform apparatus as per our specifications" which meant it "wanted a 100-foot long ladder with a bucket on the end, and to have the turntable at the base of the ladder mounted at rear of the Fire Truck, with the bucket overhanging the cab."  (*Id*. ¶¶ 14.1–15.1; Pl.'s Resp. to Def.'s 56.1 ¶¶ 14.1–15.1.)  On February 12, 2013, Plaintiff issued specifications for the Fire Truck that were prepared by Plaintiff's truck committee, which is made up of the Board of Fire Commissioners and a few other EFFD

members.  (Pl.'s Resp. to Def.'s 56.1 ¶¶ 17.1–18.1.)  On April 8, 2013, Neville submitted its bid

with proposal specifications to Plaintiff.  (*Id*. ¶ 19.1.)  Neville adds that it first "reviewed EFFD's

specifications and communicated with Ferrara about whether Ferrara would be able to build a

fire truck with the specifications detailed by EFFD," and "[a]fter conferring with Ferrara and

after Ferrara expressed confidence that it could build a fire truck with the specifications required

by EFFD, Neville put together a return set of bid specifications that it sent to EFFD."  (Neville's

Resp. to Def.'s 56.1 ¶ 19.1.)  On August 14, 2013, EFFD signed off on the Final Shop Order for

the Fire Truck.  (*Id*. ¶ 20.1; Pl.'s Resp. to Def.'s 56.1 ¶ 20.1)

A Neville representative, possibly Heidrich, met with EFFD's Chairman of the Board,

William McClellan ("McClellan"), and went over all of the specifications for the Fire Truck, and

McClellan individually signed off on each one.  (Neville's Resp. to Def.'s 56.1 ¶ 21.1.)  After the

Final Shop Order was approved by EFFD, the order was submitted to Ferrara.  (*Id*. ¶ 22.1.)

Ferrara confirmed that the Fire Truck was built in accordance with the specifications.  (*Id*. ¶

23.1; Pl.'s Resp. to Def.'s 56.1 ¶ 23.1.)  Heidrich testified that the manufacture of the Fire Truck

complied with NFPA 1901, and that the Fire Truck was manufactured to fully comply with the

specifications.  (Neville's Resp. to Def.'s 56.1 ¶ 24.1; Pl.'s Resp. to Def.'s 56.1 ¶ 24.1.)

McClellan and other members of EFFD testified that the Fire Truck was manufactured in

accordance with the specifications.  (Neville's Resp. to Def.'s 56.1 ¶ 25.1; Pl.'s Resp. to Def.'s

56.1 ¶ 25.1.)

Ferrara and EFFD entered into a 2014 Apparatus Contract for the Fire Truck.  (Neville's

Resp. to Def.'s 56.1 ¶ 26.1; Pl.'s Resp. to Def.'s 56.1 ¶ 26.1.)  The 2014 Apparatus Contract

provides that the agreement was made on May 1, 2013, and that: "This agreement does not

become binding until it is agreed to and accepted in writing and is properly signed by an officer

of [Ferrara]."  (Neville's Resp. to Def.'s 56.1 ¶ 27.1; Pl.'s Resp. to Def.'s 56.1 ¶ 27.1.)  The 2014

Apparatus Contract was not accepted and signed by Ferrara until February 28, 2014.  (Neville's

Resp. to Def.'s 56.1 ¶ 28.1; Pl.'s Resp. to Def.'s 56.1 ¶ 28.1.)

> The 2014 Apparatus Contract further provides:
>
> INSPECTION – [EFFD] shall inspect the apparatus immediately upon delivery and shall give written notice of any defects with Ten (10) days. The vehicle(s) shall be deemed accepted if [EFFD] fails to give such notice. [EFFD] expressly waives any rights [EFFD] may have to revoke acceptance after the Ten (10) day period.

(Neville's Resp. to Def.'s 56.1 ¶ 29.1; Pl.'s Resp. to Def.'s 56.1 ¶ 29.1.)  The 2014 Apparatus

Contract provides that it "shall be construed and interpreted and its performance shall be

governed by the laws of the state in which [Ferrara] is domiciled."  (Neville's Resp. to Def.'s

56.1 ¶ 30.1; Pl.'s Resp. to Def.'s 56.1 ¶ 30.1.)

Ferrara's Dealer Handbook provides that upon completion of the Fire Truck, Neville was

required to come to Ferrara's factory in Louisiana to inspect the apparatus, and to make a list of

"any and all items that are not satisfactory or do not comply with the specifications" and to

provide it to Ferrara.  (Neville's Resp. to Def.'s 56.1 ¶ 31.1.)  The pre-delivery inspection of the

Fire Truck took place at Ferrara's factory in Louisiana on November 6 and 7, 2014.  (*Id*. ¶ 32.1;

Pl.'s Resp. to Def.'s 56.1 ¶ 32.1.)  EFFD performed a visual inspection of the Fire Truck on

November 6, 2014, and an operational inspection on November 7, 2014.  (Neville's Resp. to

Def.'s 56.1 ¶ 33.1; Pl.'s Resp. to Def.'s 56.1 ¶ 33.1.)  EFFD operated the Fire Truck, including

the aerial (the ladder), on November 7, 2014.  (Neville's Resp. to Def.'s 56.1 ¶ 34.1; Pl.'s Resp.

to Def.'s 56.1 ¶ 34.1.)

A punch list was generated from the two-day inspection with all the issues that EFFD

and/or Neville found with the Fire Truck—a preliminary punch list after the first day of the

inspection and a final punch list after the second day of the inspection containing items from

both inspection days.  (Neville's Resp. to Def.'s 56.1 ¶ 35.1; Pl.'s Resp. to Def.'s 56.1 ¶ 35.1.)
All the issues on the punch list were addressed and resolved prior to delivery.  (Neville's Resp.
to Def.'s 56.1 ¶ 36.1; Pl.'s Resp. to Def.'s 56.1 ¶ 36.1.)  Nothing on the punch list related to
operational issues with the Fire Truck, the Fire Truck's avoidance system, or the aerial ladder.
(Neville's Resp. to Def.'s 56.1 ¶ 37.1; Pl.'s Resp. to Def.'s 56.1 ¶ 37.1.)

The 2014 Apparatus Contract provides that the Fire Truck was to be delivered within 270
calendar days.  (Neville's Resp. to Def.'s 56.1 ¶ 38.1; Pl.'s Resp. to Def.'s 56.1 ¶ 38.1.)  On
December 29, 2014, Ferrara delivered the Fire Truck to Neville.  (Neville's Resp. to Def.'s 56.1
¶ 44.1; Pl.'s Resp. to Def.'s 56.1 ¶ 44.1.)  The Dealer Delivery Acceptance Notice ("DDAN"),
which was signed by Neville, acknowledged that the Fire Truck was in satisfactory construction
upon delivery and that Neville accepted it subject to certain minor shortages.  (Neville's Resp. to
Def.'s 56.1 ¶ 45.1.)  Neville inspected the Fire Truck upon delivery and acknowledged receipt of
the Fire Truck "subject, however, to the shortages and/or minor adjustments listed at the bottom
of this document, if any."  (*Id*. ¶ 47.1.)  The only shortages listed on the DDAN were pike poles
and a 20' ladder.  (*Id*. ¶ 46.1.)  Neville's owner confirmed that the Fire Truck operated as it was
supposed to upon delivery by Ferrara.  (*Id*. ¶ 48.1.)  The DDAN provides:

> [Neville does] hereby accept full responsibility for the care and operation of this
> vehicle from this day forward. Further, upon acceptance of this vehicle, we fully
> agree that all necessary insurance coverage has been secured on said vehicle and
> additionally, naming Ferrara Fire Apparatus as additional insured.

(*Id*. ¶ 49.1.)

On January 18, 2015, Neville delivered the Fire Truck to EFFD.  (*Id*. ¶ 50.1; Pl.'s Resp.
to Def.'s 56.1 ¶ 50.1.)  The Customer Delivery Acceptance Notice ("CDAN"), which was signed
by EFFD, acknowledged that the Fire Truck was in satisfactory construction upon delivery, and
that EFFD accepted it subject to certain minor shortages.  (Neville's Resp. to Def.'s 56.1 ¶ 51.1;

Pl.'s Resp. to Def.'s 56.1 ¶ 51.1.)  There were certain minor shortages and deficiencies listed on

the CDAN, but EFFD acknowledged that none of them related to the avoidance system or the

aerial ladder.  (Neville's Resp. to Def.'s 56.1 ¶ 52.1; Pl.'s Resp. to Def.'s 56.1 ¶ 52.1.)  Neville's

owner operated the Fire Truck for EFFD upon this delivery so that EFFD could see it operate,

and there were no issues.  (Neville's Resp. to Def.'s 56.1 ¶ 53.1.)  McClellan testified that he did

not recall and was not positive whether EFFD gave Defendant notice of any defects within ten

days.  (Def.'s 56.1 Ex. D, at 74:4–12 (Dkt. No. 112-4).)

EFFD requested that the height of the Fire Truck be 11 feet eight inches tall because the

firehouse had 12 foot doors that it needed to fit underneath.  (Neville's Resp. to Def.'s 56.1 ¶

55.1; Pl.'s Resp. to Def.'s 56.1 ¶ 55.1.)  According to Neville's owner, when the Fire Truck was

delivered by Ferrara to Neville, it was 11 feet 10 inches tall.  (Neville's Resp. to Def.'s 56.1 ¶

56.1.)  Ferrara engineered a fix for Neville to use to lower the Fire Truck by two inches, and that

was done at Neville's facility before the Truck was delivered to EFFD and so met the

specifications.  (*Id*. ¶¶ 57.1–58.1.)  The Fire Truck would not fit in the firehouse because the new

gutters on the firehouse were too low and needed to be removed.  (Neville's Resp. to Def.'s 56.1

¶ 59.1; Pl.'s Resp. to Def.'s 56.1 ¶ 59.1.)

The purpose of an avoidance system is to prevent the aerial ladder from hitting the body

or the cab of the Fire Truck.  (Neville's Resp. to Def.'s 56.1 ¶ 60.1; Pl.'s Resp. to Def.'s 56.1 ¶

60.1.)  Ferrara posits that "[m]ultiple EFFD witnesses testified that Heidrich misrepresented the

type of avoidance system that would be installed on the Fire Truck" and that Heidrich "promised

it an avoidance system that would work beyond the limitations of the original avoidance

system."  (Def.'s 56.1 ¶¶ 61.1, 64.1.)  Neville responds that "[n]one of these witnesses [cited by

Ferrara for this proposition] recalled any specific misrepresentations made by Heidrich."

(Neville's Resp. to Def.'s 56.1 ¶ 61.1.)  McClellan testified that Heinrich "specifically told us that there's avoidance system, it's state of the art. And at the time he didn't indicate that Smeal was putting the ladder or the avoidance system on as a subcontractor."  (Def.'s 56.1 Ex. D, at 88.)  EEFD witnesses testified that they had the "impression" that the "ladder would go lower than it was actually capable of going" and that Heinrich told them "that the avoidance system would have more safety zones than it did have."  (Def.'s 56.1 Ex. L, at 40–41 (Dkt. No 112-12); Ex. Y, at 25 (Dkt. No 112-26).)  Nick Uzzolino ("Uzzolino"), Ferrara's Metro Account Manager, testified that he understood that EEFD was not "happy with the limitations of the standard collision avoidance system and they were under the belief that it would work beyond the way that system was designed" and that Plaintiff claimed the limitations of the avoidance system were never "fully explained."  (Def.'s 56.1 Ex. AA, at 19:18–21, 63:4–15 (Dkt. No 112-28).)  Finally, an email signed by Corey Erhardt ("Ehrhart"), EFFD's Fire Commissioner stated "if it weren't for a ladder protection system that a former salesman misrepresented, the rest of the things were just business as usual."  (Def.'s 56.1 Ex. Z (Dkt. No 112-27).)

The original avoidance system on the Fire Truck (Ferrara's standard avoidance system), is linked to six zones and gates around the apparatus and will keep the aerial ladder from contacting either the body or the cab.  (Neville's Resp. to Def.'s 56.1 ¶ 62.1; Pl.'s Resp. to Def.'s 56.1 ¶ 62.1.)  "When the original avoidance system sees an object and you set it, it stays at that level until it clears to another gate (if there was an obstacle, once it got past the obstacle it would not lower until it went past another gate)."  (Neville's Resp. to Def.'s 56.1 ¶ 63.1; Pl.'s Resp. to Def.'s 56.1 ¶ 63.1.)  EEFD wanted an avoidance system that would carve around the obstacles, meaning that as soon as it got past an obstacle, there would be more functionality and a more robust operating envelope.  (Pl.'s Resp. to Def.'s 56.1 ¶ 65.1.)

12

In March 2015 (two months after delivery), EFFD alleges that it first began experiencing "problems" with the avoidance system.  (Neville's Resp. to Def.'s 56.1 ¶ 66.1; Pl.'s Resp. to Def.'s 56.1 ¶ 66.1.)  Ferrara states that "McClellan, EFFD's Chairman of the Board, completely misunderstands the original avoidance system on the Fire Truck."  (Def.'s 56.1 ¶ 67.)  In support, Ferrara cites to McClellan's deposition, where he states he was not trained to nor had ever operated an aerial platform and his repeated assertions that the Truck did not have an avoidance system, e.g. his statement that: "when we got it it didn't have an avoidance system, so when you go to swing it at a low level you crash into any obstruction on top of the [T]ruck including the cab."  (Def.'s 56.1 Ex. D, at 26–27, 47–48, 81, 84.)  McClellan testified that Neville "was a negligent dealer" that got Ferrara "caught up in a situation."  (*Id*. at 128–129.)

> In his affidavit, Heidrich affirmed:
>
> At no point did I ever misrepresent the functionality of the cab avoidance system to EFFD. I informed EFFD that the Fire Truck would contain a cab avoidance system, which it did.  The cab avoidance system installed in the Fire Truck was the only cab avoidance system sold by Ferrara at that time.  At no point did I tell EFFD that a specific cab avoidance system would be installed. Moreover, at the Pre-Delivery Meeting, Neville and Ferrara reviewed with EFFD the precise specifications and parameters for the Fire Truck. As part of the demonstration of the Fire Truck, EFFD representatives, including Mr. McClellan, observed the aerial apparatus and the cab avoidance system and noted no shortcomings or deficiencies with it.

(Heidrich Aff. ¶ 30 (Dkt. No. 124).)

Defendant states that "[a]lthough the original avoidance system was built to specification, and was inspected and accepted by EFFD, Ferrara sought to resolve EFFD's complaints." (Def.'s 56.1 ¶ 69.)  Plaintiff responds that the citations do not support this statement.  (Pl.'s Resp. to Def.'s 56.1 ¶ 69.1.)  For instance, in response to the question "do you agree that the vehicle was built and operates to the specifications that were issued" McClellan responded that "[a]t that time I believe the avoidance system was on there, so, yes I do."  (Def.'s 56.1 Ex. D, at 125.)  An

13

EFFD witness testified that the Truck did not deviate from "these specifications," but that it was "not what we wanted as far as all that was told of what we wanted.  So yes, it definitely does where it doesn't hit the body, but it also stayed two feet above the body and would not deviate from that, which was unacceptable."  (Def.'s 56.1 Ex. L, at 107:1–9.)  Uzzolino testified that Ferrara paid for the installation of the AL-11 to "appease the customer's expectations."  (Def.'s 56.1 Ex. AA, at 27:1–5.)  Uzzolino additionally testified that "the [T]ruck's avoidance system prior to the installation of the AL-11 Smeal system but starting from the delivery date in January of 2015" performed according to the "specification which begins apparatus body damage control interlock system."  (*Id.* at 67:5–15.)  Finally, Defendant points to an email by its COO which states "[a]lthough the vehicle is built and operates to the specifications issued, inspected, and accepted, I would like to outline a resolution to your request to have greater flexibility operating from the front of the vehicle."  (Def.'s 56.1 Ex. CC (Dkt. No. 112-30).)  Neville and Defendant agree that Defendant, at its own cost, had a new avoidance system, the Smeal AL-11, installed on the Fire Truck.  (Neville's Resp. to Def.'s 56.1 ¶ 70.1.)  Unlike the original avoidance system, the Smeal AL-11 had an infinite number of zones, "meaning that as soon as you clear an obstacle, you do not have to wait to go to another gate or another zone."  (Neville's Resp. to Def.'s 56.1 ¶ 71.1; Pl.'s Resp. to Def.'s 56.1 ¶ 71.1.)  EFFD was very happy with the Smeal AL-11, and McClellan and others testified that it resolved all of EFFD's issues with the avoidance system.  (Pl.'s Resp. to Def.'s 56.1 ¶ 72.1.)  As another offer of good faith, Ferrara extended the warranty period on the Fire Truck to begin when it was returned to EFFD with the Smeal.  (*Id.* ¶ 73.1.)  On July 30, 2015, McClellan wrote to EFFD members: "Just so everybody knows officially the retrofit to the AL-11 system was a great success."  (*Id.* ¶ 74.1.)  On July 30, 2015, McClellan wrote to Ferrara: "Mr. Ferrara, we went to Smeal yesterday, for final inspection of the

AL-11 System.  The East Fishkill Fire District is VERY pleased with the retrofit of the AL-11

System that was installed. I'm very pleased that you and your company stepped up and are

performing."  (*Id*. ¶ 75.1.)  On August 26, 2015, the entire EFFD Board of Fire Commissioners

sent a letter to Ferrara which stated: "The East Fishkill Fire District Board of Fire

Commissioners would like to thank you for all your assistance with the purchase of our ladder

truck . . . The Board would also like to thank Ms. LaDonna and Nick Uzzolino for their unending

diligence in resolving the District's truck issues."  (*Id*. ¶ 76.1.)

       Heidrich worked as salesperson for Neville from 2008 through the end of 2014 or the

beginning of 2015.  (Def.'s 56.1 Ex. B, at 14–15 (Dkt. No. 112-2); Heidrich Aff. ¶ 26.)  During

the course of his work with EFFD, Heidrich had communication issues with EFFD.  (Neville's

Resp. to Def.'s 56.1 ¶ 78.1.)  On October 7, 2014, EFFD's Secretary/Deputy Treasurer, Kathe

Kaye ("Kaye"), wrote to Heidrich: "Just a heads up, the Chairman of the Board is not happy. We

haven't heard back from you in almost two weeks regarding the travel dates, bell and updated

pictures on-line. He is seriously considering going to the Board and recommending termination

of the contract with Neville Apparatus."  (Neville's Resp. to Def.'s 56.1 ¶ 79.1; Pl.'s Resp. to

Def.'s 56.1 ¶ 79.1.)  On October 23, 2014, McClellan wrote to Heidrich: "John, Kathe has been

trying to e-mail you. Is all good? She is VERY CONCERNED, please call her or write!"

(Neville's Resp. to Def.'s 56.1 ¶ 80.1; Pl.'s Resp. to Def.'s 56.1 ¶ 80.1.)  On December 17, 2014,

Kaye wrote to Neville's owners and sent them several examples of Heidrich emails to help them

"understand the frustration we have had in dealing with John."  (Neville's Resp. to Def.'s 56.1 ¶

81.1; Pl.'s Resp. to Def.'s 56.1 ¶ 81.1.)  On January 2, 2015, McClellan wrote to members of

EFFD: "I just received a call from our sales person, JOHN, he started asking for information on

who has all the change orders? . . . I WOULD SUGGEST THAT WE DO NOT DEAL WITH

OUR PAST SALESPERSON ONLY THE TWO OWNERS OF NEVILLE."  (Neville's Resp. to

Def.'s 56.1 ¶ 82.1; Pl.'s Resp. to Def.'s 56.1 ¶ 82.1.)  On January 3, 2015, one of Neville's

owners, Robert Radecki, admitted that Neville had communications issues: "From what I have

seen to this point there clearly have been communication issues.  I cannot repair those particular

issues, I can only promise to work as diligently as I have been to achieve my original goal."

(Neville's Resp. to Def.'s 56.1 ¶ 83.1; Pl.'s Resp. to Def.'s 56.1 ¶ 83.1.)

On February 12, 2015, Karl Vollmer ("Vollmer"), President of Hopewell Hose (where

the Fire Truck was located), wrote to Neville:

> It is my understanding that the salesman in this deal was a major problem. Well he,
> for all intents and purposes, **IS** Neville Fire Apparatus . . . As I understand it, we
> were lied to by your company (as I said before your salesman is your company) and
> we were informed that things we wanted were not possible.

(Neville's Resp. to Def.'s 56.1 ¶ 84.1; Pl.'s Resp. to Def.'s 56.1 ¶ 84.1.)

McClellan testified that "the salesman in this deal was a major problem . . . [a]ll along,"

namely once "the build started."  (Def.'s 56.1 Ex. D, at 113:23–14:7.)  An EFFD member agreed

that "the salesman in this deal was a major problem," that they were lied to by Neville, and that

Neville's salesman informed them that things they wanted were not possible.  (Def.'s 56.1 Ex.

RR, at 59:23–60:19 (Dkt. No. 112-45).)

An EFFD member testified that Heidrich told him that the dunnage compartment, the

area underneath the ladder could not be bigger but when he "got to Ferrara [he] realized they

could be bigger."  (Def.'s 56.1 Ex. L, at 29–30.)  Vollmer testified that he learned that requests

had been made about compartment space but that "East Fishkill was told that there was no room

for the compartments."  (Def.'s 56.1 Ex. PP, at 42:2–12 (Dkt. No. 112-43).)  In an email to

Neville, Vollmer stated: "We were out and out lied to!!! We were informed that transverse

compartments were not possible because the ladder sat too low.  NOT TRUE !!!  Now we have a

huge empty space beneath the ladder."  (Def.'s 56.1 Ex. QQ (Dkt. No. 112-44).)  An EFFD member additionally testified that "they wanted to make cabinets and they were told they couldn't," but that when the Truck was delivered "the space that they wanted to make cabinets was just a void that certainly could have made cabinets."  (Def.'s 56.1 Ex. RR, at 54:12–23.) However, Heidrich stated in his affidavit that "I never made any misrepresentations concerning the storage compartment space in the Fire Truck.  On February 13, 2014, Ferrara executed a Change Order for the Fire Truck that included the addition of two roof mounted saw boxes." (Heidrich Opp. Aff. ¶ 4 (Dkt. No. 142).)

EFFD continuously praised Ferrara's personnel and customer service:

- McClellan stated that Ferrara has sent EFFD "very reliable and competent people in the past and I hope for that professional relationship to continue for the next 25 years."

- "I would HOPE you don't believe Neville! They did NOTHING but Nick from Ferrara and Chris owner Ferrara bent over backwards to assist us through this fiasco with Neville. Just so you know the East Fishkill Fire Dist. Will never do business with Neville again. . . . We will however work with Ferrara direct in the future."

- "On a lighter note, if it was wasn't (*sic*) for LaDonna at Ferrara and her knowledge and professionalism, the Board would have cancelled this contract."

(Neville's Resp. to Def.'s 56.1 ¶ 87.1; Pl.'s Resp. to Def.'s 56.1 ¶ 87.1.)

Members of EFFD have testified that they observed the bucket in a drooped position in the firehouse after it was left alone for a number of hours.  (Neville's Resp. to Def.'s 56.1 ¶ 88.1; Pl.'s Resp. to Def.'s 56.1 ¶ 88.1.)  The bucket drooping would occur over time when the Fire Truck was stowed and parked at the firehouse; the bucket would be level and then hours later or the next day it would be tilted down between five and 15 degrees.  (Neville's Resp. to Def.'s 56.1 ¶ 89.1; Pl.'s Resp. to Def.'s 56.1 ¶ 89.1.)[3]  Kevin McNamara ("McNamara"), EFFD's

_____

[3] The Court notes that the Parties describe the bucket as both "dropping" and "drooping."

current Chairman of the Board, testified that the only time he witnessed the drooping was sometime in 2018.  (Neville's Resp. to Def.'s 56.1 ¶ 90.1; Pl.'s Resp. to Def.'s 56.1 ¶ 90.1.) Uzzolino told EFFD that bucket drooping could be caused by a temperature differential, external leakage, or a static load in the bucket.  (Neville's Resp. to Def.'s 56.1 ¶ 91.1; Pl.'s Resp. to Def.'s 56.1 ¶ 91.1.)  Indeed, the firehouse is not climate controlled and does not have any air conditioning.  (Neville's Resp. to Def.'s 56.1 ¶ 92.1; Pl.'s Resp. to Def.'s 56.1 ¶ 92.1.)  In September 2018, Ferrara took possession of the Fire Truck for over a month to assess the allegations of bucket drooping, and during that time the bucket never drooped.  (Neville's Resp. to Def.'s 56.1 ¶ 93.1; Pl.'s Resp. to Def.'s 56.1 ¶ 93.1.)  Ferrara never heard any further complaints of the bucket drooping after it returned the Fire Truck to EFFD.  (Pl.'s Resp. to Def.'s 56.1 ¶ 94.1.)  David Palin ("Palin"), an EFFD member, testified that he could not recall any other instances where the bucket drooped after it was returned to EFFD.  (Pl.'s Resp. to Def.'s 56.1 ¶ 95.1; Def.'s 56.1 Ex. Y, at 46.)

The first instance of the bucket allegedly dropping was on November 7, 2016 (one year and nine months after delivery of the Fire Truck) during a first Monday of the month inspection of the Fire Truck at the firehouse.  (Pl.'s Resp. to Def.'s 56.1 ¶ 96.1; Pl.'s 56.1 ¶ 17.)  Jay DeCrenza ("DeCrenza"), an EFFD volunteer firefighter, was performing the monthly inspection when he claims that the bucket drooped downward.  (Pl.'s Resp. to Def.'s 56.1 ¶ 97.1.) DeCrenza was operating the lowering level (to lower the aerial) from the turntable; he was looking at the uprights on the cab, and when he looked back up the bucket was drooped downward (he did not see it drop).  (*Id.* ¶ 98.1.)  The second instance of the bucket allegedly drooping was on August 5, 2019 (two years and eight months after the first instance, and four and half years after delivery of the Fire Tuck) during Vern Jackson's funeral.  (*Id.* ¶ 99.1.)  Vern

Jackson was a member of EFFD, and the Fire Truck was displayed at his funeral with an American flag hanging from the bucket.  (*Id.* ¶ 100.1.)  The EFFD members on duty at the funeral were Scott Beyer ("Beyer"), Chief Steve Conti ("Conti"), DeCrenza, and Patrick Cirrinicione.  (*Id.* ¶ 101.1.)  DeCrenza was operating the Fire Truck from the turntable, Beyer was at the front of the Fire Truck waiting to collect the flag, and Conti was not far from Beyer.  (*Id.* ¶ 102.1.)  According to Beyer, when the bucket was being lowered and got close to the ground, "the flag just rapidly bundled into my arms."  (*Id.* ¶ 103.1.)  DeCrenza was operating the lowering level from the turntable and was looking at the uprights on the cab and not the bucket.  (*Id.* ¶ 104.1.)  Neither Beyer, Conti nor DeCrenza saw the bucket drop.  (*Id.* ¶ 105.1.)  McNamara was at Vern Jackson's funeral and testified that he was driving his car leaving the funeral when he saw the bucket drop 15 to 20 degrees.  (*Id.* ¶ 106.1.)  McNamara, however, mistakenly believed the aerial was being operated from the bucket rather than the turntable.  (*Id.* ¶ 107.1.)  EFFD did not try and have the platform repaired, instead it "took it out of service and said enough is enough."  (Def.'s 56.1 Ex. N, at 32:16–22.)  Kaye, Palin, and Beyer testified that the Truck was taken out of service because of the bucket dropping issue.  (Def.'s 56.1 ¶ 109.1.)[4] On March 12, 2021, Ferrara operated the Fire Truck at an inspection and did not find any operational issues, including any bucket dropping; the Fire Truck operated as expected.  (Pl.'s Resp. to Def.'s 56.1 ¶ 110.1.)

McNamara and Kevin Geysen ("Geysen"), EFFD's former District Chief, testified that they were aware of complaints the ladder on the Fire Truck did not rotate 360 degrees.  (*Id.* ¶ 111.1.)  On November 8, 2014, when the Fire Truck was tested at the pre-delivery inspection, the

---

[4] While Plaintiff disputes this, asserting that the Truck was taken out of service due to the bucket dropping and the ladder's failure to rotate, the only source it points to is the Amended Complaint for support.

ladder was tested, and it rotated 360 degrees.  (*Id.* ¶ 112.1.)  On January 18, 2015, when the Fire

Truck was delivered to EFFD, the ladder was tested, and it rotated 360 degrees.  (*Id.* ¶ 113.1.)

Geysen testified that he was aware of complaints concerning the rotation of the aerial ladder,

including that it would not rotate 360 degrees.  (*Id.* ¶ 114.1.)  Geysen testified that he never

experienced that problem himself with the Fire Truck and that he was not aware of the names of

anyone that experienced this problem.  (*Id.* ¶ 115.1.)  Geysen does not recall who told him about

this issue, nor could he provide any dates or times of it occurring.  (*Id.* ¶ 116.1.)  McNamara also

testified that he was "aware of" complaints that the ladder did not rotate 360 degrees.  (*Id.* ¶

117.1.)  Like Geysen, however, McNamara testified that he had no idea who made the complaint

concerning the ladder, when it occurred, or whether it was resolved.  (*Id.* ¶ 118.1.)  Palin testified

that when EFFD believed that there was an issue with the avoidance system, they thought the

ladder did not rotate 360 degrees because the ladder would not operate close to the body to avoid

crushing it.  (*Id.* ¶ 119.1.)  The issue Palin was referring to, however, was resolved completely by

the installation of the new AL-11 avoidance system.  (*Id.* ¶ 120.1.)

An email from Tom Smeal, with the subject line "East Fishkill dead spot," an Aerial

Product Specialist to Rich Rossow from Ferrara states:

> The electrical Engineer is Mike Hansen, and I spoke with him awhile ago and he
> confirmed what I told Drew, that there was not a fix for this spot as it comes from
> rotation backlash of the turntables. All of the machines that use this rotation system
> have it and have had it since the beginning. So that being said there is no problem
> except the unit can and may stop briefly but can easily be moved slightly and
> proceed with operations.

(Def.'s 56.1 Ex. R (Dkt. No. 112-19).)[5]  On March 12, 2021, during the Parties' inspection of the Fire Truck, the ladder was tested and it rotated 360 degrees.  (Pl.'s Resp. to Def.'s 56.1 ¶ 123.1.)

> On November 17, 2015, Erhardt wrote to EFFD members:
>
> I suppose when push comes to shove, Bill is right, if it weren't for a ladder protection system that a former salesman misrepresented, the rest of the things were just business as usual. In the grand scope, they are not big issues and nothing more than we could have expected from any other manufacturer

(Neville's Resp. to Def.'s 56.1 ¶ 124.1; Pl.'s Resp. to Def.'s 56.1 ¶ 124.1.)  The EFFD members agree that any fire apparatus is going to require service and repairs, and that it is common for fire apparatus to have mechanical issues.  (Pl.'s Resp. to Def.'s 56.1 ¶ 125.1.)  New York State Fire Reports, as well as testimony of several EFFD members, establish that the Fire Truck was in use on alarm calls and fire events throughout 2016, 2017, 2018 and 2019.  (*Id.* ¶ 126.1.)  In addition, the Fire Truck was used for training and other non-alarm call events (such as parades and funerals) throughout 2015, 2016, 2017, 2018 and 2019.  (*Id.* ¶ 127.1.)

In his affidavit, McNamara affirmed that the Truck "remains out of service due to the fact that Fishkill finds the [T]ruck useless to the point of posing a safety hazard during any potential rescue."  (McNamara Aff. ¶ 9 (Dkt. No. 117).)  In his affidavit, McNamara affirmed that the Truck has approximately 12,000 miles on it of which 9,000 are related to repairs and that the Truck has been in and out of Ferrara's custody a total of 24 times since the date of delivery due to defects.  (Pl.'s 56.1 ¶¶ 31–32; McNamara Aff.

---

[5] Plaintiff disputes that this is the only evidence underlying its claim concerning the ladder not rotating 360 degrees pointing to the entirety of McNamara and Geysen's depositions. (Pl.'s 56.1 response ¶ 121.1.)  Defendant additionally adds that Mike Hansen testified "I don't see a problem defined in this" referring to this email.  (Def.'s 56.1 ¶ 122.)

¶¶ 7, 15.)  Ferrara responds that there is no evidence in the record to support these claims. (Def.'s Resp. to Pl.'s 56.1 ¶¶ 31–32.)

    B.  Procedural History

Plaintiff commenced the instant Action on January 22, 2020 against Ferrara.  (*See* Compl. (Dkt. No. 1).)  Plaintiff filed its Amended Complaint on January 29, 2020.  (Am. Compl. (Dkt. No. 10).)  On December 1, 2020, Defendant filed a third-party complaint against Neville.  (Dkt. No. 34.)  Neville filed a counterclaim against Ferrara on January 18, 2021.  (*See* Dkt. No. 44.) Defendant amended its third-party complaint on October 12, 2021.  (*See* Dkt. No. 72.) Defendant filed a Motion for Summary Judgment against Plaintiff and Neville on October 31, 2022.  (*See* Not. of Mot. (Dkt. No. 110); Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 113).)  Defendant additionally submitted a motion to disqualify Plaintiff's expert that same day.  (Def.'s Daubert Mem (Dkt. No. 107).)  Plaintiff filed a Motion for Summary Judgment and to disqualify Defendant's expert on October 31, 2022.  (*See* Mem. of Law in Supp. of Mot. ("Pl.'s Mem.") (Dkt. No. 118).)  Neville filed its Motion for Summary Judgment against Defendant on October 31, 2022.  (*See* Not. of Mot. (Dkt. No. 121); Mem. of Law in Supp. of Mot. ("Neville Mem.") (Dkt. No. 123).)

Defendant, Plaintiff and Neville submitted their Oppositions on December 5, 2022.  (*See* Mem. of Law in Opposition to Mot. ("Def.'s Pl. Opp.") (Dkt. No. 129); Mem. of Law in Opposition to Mot. ("Def.'s Neville Opp.") (Dkt. No. 132); Mem. of Law in Opposition to Mot. ("Pl.'s Opp.") (Dkt. No. 137) Mem. of Law in Opposition to Mot. ("Neville Opp.") (Dkt. No. 140).)  Defendant, Plaintiff, and Neville replied on December 19, 2022.  (*See* Reply to Mot. ("Def.'s Pl. Reply Mem.") (Dkt. No. 144); Reply to Mot. ("Def.'s Neville Reply Mem.") (Dkt.

No. 145); Reply to Mot. ("Pl.'s Reply Mem.") (Dkt. No. 149); Reply to Mot. ("Neville Reply Mem.") (Dkt. No. 150).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *accord Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts

showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d

Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the

pleadings," *Guardian Life Insurance Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014)

(quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a

motion for summary judgment is properly supported by documents or other evidentiary

materials, the party opposing summary judgment may not merely rest on the allegations or

denials of his pleading . . . .").

     "On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental

Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role

of the court is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). Thus, a court's goal

should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp.

v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

     As noted, when ruling on a motion for summary judgment, a district court should

consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier

Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or

deposition testimony to establish facts, the statements 'must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the affiant or declarant is

competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012)

(quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639,

643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with

affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge.").

### B.  Analysis

Defendant moves for summary judgment against Plaintiff for all claims brought by Plaintiff—redhibitory defects, breach of contract, and unjust enrichment, and against Neville for Defendant's breach of contract and contractual indemnification claims.  (*See generally* Def.'s Mem.)  Plaintiff moves for summary judgment against Defendant for its redhibitory defects claim.  (*See generally* Pl.'s Mem.)  Neville moves for summary judgment on Defendant's breach of contract claim, contribution and indemnification claims, and on its counterclaims for indemnification and contribution.  (*See generally* Neville Mem.)

#### 1.  Expert Witness Exclusion

As an initial matter, the Court will address Plaintiff and Defendant's putative motions to disqualify each other's expert witnesses.  (*See generally* Pl.'s Mem; Def.'s Daubert Mem.)  As Defendant rightfully points out, while Plaintiff "disclosed a liability expert for this matter – Anthony Racioppo ("Racioppo") – and produced him for a deposition, [] it wholly failed to rely on that expert in support of its Motion for Summary Judgment," indeed "Racioppo is not mentioned once in EFFD's Memorandum of Law [], and EFFD does not submit an affidavit from him or his expert report to establish a redhibitory defect."  (Def.'s Pl. Opp. 4.)  Furthermore, Plaintiff has not substantively referred to its expert in its 56.1 statement, Reply, or Opposition to Defendant's Motion for Summary Judgment.  Plaintiff's only reference to its expert is in

opposition to Defendant's motion to preclude Plaintiff's expert.  (Pl. Opp. 12–14.)  Accordingly, as Plaintiff does not rely on its expert to affirmatively support its Motion for Summary Judgment or oppose Defendant's Motion for Summary Judgment, the Court denies Defendant's motion to preclude Plaintiff's witness without prejudice until a time such a request becomes ripe.

Plaintiff argues that Defendant's expert, Brian Boggess' ("Boggess") testimony is "not relevant to the task at hand," because his qualifications do not "align with the issues in the case." (Pl.'s Mem. 14.)  Plaintiff points out that Boggess "has a background largely specialized in mechanical engineering and biomechanics" that "ultimately led to experience obtained via accident reconstructions," and that because the instant matter does not involve accident or injury, Boggess is not qualified to testify.  (*Id.* at 13–14.)  Plaintiff further notes that Boggess was unable to identify 1) whether he had previously been qualified to testify as an expert in federal court in any relevant manner, including cases involving a fire truck, 2) if there had been limitations placed on his testimony if he had qualified as an expert, 3) if he was ever tendered as an expert but not accepted, 4) if he was ever barred from testifying, and 5) the definition of redhibition under Louisiana law, and that Plaintiff was therefore "unable to ascertain whether the testimony proffered by [Boggess] is going to be reliable in this case."  (*Id.* at 14.)  Plaintiff clarifies in its Reply that it "is not questioning the validity of [Boggess] qualifications, education, experience and training," but is arguing that his "qualifications, education, experience and training, which are all related to accident reconstruction, are not aligned with the issues in this case."  (Pl.'s Reply Mem. 7.)

At the summary judgment stage, a court can "decide questions regarding the admissibility of evidence, including expert opinion evidence[.]"  *Gjini v. U.S.*, No. 16-CV-3707, 2019 WL 498350, at *13 (S.D.N.Y. Feb. 8, 2019) (alteration in original) (quoting *Bah v. Nordson Corp.*,

No. 00-CV-9060, 2005 WL 1813023, at *6 (S.D.N.Y. Aug. 1, 2005)).  "If a proffer of expert

testimony is excluded as inadmissible pursuant to [Federal Rule of Evidence] 702, the court must

make the summary judgment determination on a record that does not include that evidence."

*Colon ex rel. Molina v. BIC USA, Inc*., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).  Rule 702 of the

Federal Rules of Evidence provides that a:

> witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.

Fed. R. Evid. 702.

Although it is the role of the jury to determine the credibility of an expert witness, it is

the role of the trial court to serve as a "gatekeep[er]" to ensure that the expert testimony is

reliable and relevant before it is presented to the jury.  *See Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 147 (1999) (finding that the trial judge's gatekeeping obligation applies to all expert

testimony); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (holding that the

district court must ensure that a witness is qualified as an expert and "that an expert's testimony

both rests on a reliable foundation and is relevant to the task at hand").

"[T]he proponent of expert testimony has the burden of establishing by a preponderance

of the evidence that the admissibility requirements of Rule 702 are satisfied."  *I.M. v. United

States*, 362 F. Supp. 3d 161, 191 (S.D.N.Y. 2019) (alteration in original) (quoting *United States

v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also LVL XII Brands, Inc. v. Louis Vuitton

Malletier S.A.*, 209 F. Supp. 3d 612, 635 (S.D.N.Y. 2016) (same).  "[T]he trial judge has broad

discretion in the matter of the admission or exclusion of expert evidence[.]"  *Salem v. United

27

*States Lines Co.*, 370 U.S. 31, 35 (1962); *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213 (2d Cir. 2009) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous.").

The Court must first address "the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quotation marks omitted). In doing this, the Court asks "whether the proffered expert has the educational background or training in a relevant field . . . by looking at the totality of the witness's background." *Arista Recs. LLC v. Lime Grp. LLC*, No. 06-CV-5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (citations and quotation marks omitted). Then, the Court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony" to "ensure that the expert will actually be testifying on issues or subject matters within his or her area of expertise." *Id.* (alteration, citations, and quotation marks omitted). Courts in the Second Circuit liberally construe the expert qualifications requirement, and generally will not exclude expert testimony provided "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question[.]" *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.").

Here, Boggess has a B.S. in Mechanical Engineering and an M.S. in Mechanical and Aerospace Engineering from the University of Virginia.  (Boggess Aff. Ex. 1 (Dkt. No. 114-1).) He has decades of experience as an engineer and has specialized in "product evaluation/safety, and mechanical system failures," has done biomechanics work assessing "injury risk and potential related to exposures in the areas of . . . aerial lifts, power equipment, and product failures," has mechanical engineering experience with "performance matters related to failures of or issues arising from aerial lifts, power tools and equipment, forklifts, motor vehicles, construction equipment, and other similar mechanical systems."  (*Id*.)  Looking at the totality of Boggess' background, the Court concludes that he has the educational credentials, experience, and training to qualify as an expert in this case.  Indeed, an expert "need not be a specialist in the exact area [] implicated by the plaintiff[s'] injury, [but] he must have relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative." *Alves v. Affiliated Care of Putnam, Inc.*, No. 16-CV-1593, 2022 WL 1002817, at *7 (S.D.N.Y. Mar. 30, 2022) (citation and quotation marks omitted).  Additionally, "[Plaintiff] may cross-examine [Boggess] about the gaps in his credentials and argue that the fact finder should not give much or any weight to [Boggess'] testimony.  But it is not for the Court at this stage to assess [Boggess'] credibility or to decide how much weight his testimony should be given." *Id*.

The Court must next "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony" to "ensure that the expert will actually be testifying on issues or subject matters within his or her area of expertise." *Arista Recs. LLC v. Lime Grp. LLC*, No. 06-CV-5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (alteration, citations, and quotation marks omitted).  Here, Boggess arrives at the following conclusions:

- EFFD originated the Truck specifications, Neville bid on and was accepted as the dealer of the Truck, EFFD and Neville collaboratively established the specifications for the Truck which were provided to Ferrara, and EFFD and Neville inspected and tested the Truck numerous times before accepting delivery of the Truck in January 2015.

- Neville either had a significant lack of communication with EFFD and/or misrepresented the avoidance system capabilities to EFFD during the procurement process for the Truck.

- Neville violated its Dealer Agreement by failing to promptly fulfill their respective obligations with respect to any warranty claims and reportedly making false statements and/or misrepresentations, which led to an overall failure to maintain good customer (e.g., EFFD) rapport.

- Ferrara, as the manufacturer, provided reasonable and acceptable service to EFFD for the Truck.  Ferrara exceeded their responsibilities by upgrading the Truck (e.g., Smeal AL-11 Collison Avoidance System), as well as extending the warranty on the Truck.

- Ferrara manufactured and delivered the Truck to EFFD in a manner consistent with the design specification and drawings created and provided to them through the collaborative work product of EFFD and Neville. This includes the ladder-to-cab avoidance system and the turntable rotation.

- The Truck, as delivered by Ferrara to EFFD through Neville, is consistent with National Fire Protection Association ("NFPA") 1901, Automotive Fire Apparatus, as it relates to the claimed and/or evaluated issues.

- At all times, the as-delivered and retro-fitted Truck complied with the duties established for a manufacturer, such as Ferrara, within the industry standard NFPA 1901.

- The Truck's hydraulic system and platform leveling system were found to function appropriately, remain level under intended operational status, and hold without excessive drift in a de-energized state.

- The repeated and regular usage of the Truck by EFFD through July 2019 establishes that either the Truck was fit for usage and/or EFFD repeatedly failed to adhere to NFPA 1911.

- NFPA 1911 sets forth the grounds for considering the retirement from service of fire apparatus and is specifically focused on the safety of continued use. EFFD failed to adhere to NFPA 1911 in its maintenance, as well as in determining whether the Truck should be removed from service.

- EFFD has no reasonable basis to assert that the Truck has a safety concern or issue, and furthermore, Boggess did not identify any basis for removing the Truck from service either from the records reviewed or from the condition of the Truck as determined during the March 2021 inspection.

- Plaintiff and its expert(s) have not identified any applicable code or standard that Ferrara failed to comply with, nor has Boggess identified any applicable code or standard violations relevant to the subject allegations.

(Boggess Aff. Ex. 3 (Dkt. No. 114-3).)

Rule 702 mandates that experts "stay within the reasonable confines of [their] subject area, and cannot render expert opinion on an entirely different field or discipline." *Davis v. Carroll,* 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013).  In other words, "[a]n expert qualified in one subject matter does not thereby become an expert for all purposes." *Id.*  "Courts in this Circuit have stricken extraneous testimony where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of his expertise . . . ." *Olin Corp. v. Lamorak Ins. Co.,* 332 F. Supp. 3d 818, 832 (S.D.N.Y. 2018) (internal quotation marks omitted); *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.,* No. 18-CV-6449, 2023 WL 2838423, at *6 (E.D.N.Y. Apr. 7, 2023) ("Where an expert testifies outside the scope of his discipline, the Court must exclude that portion of his testimony.").  This includes any effort by the expert to usurp "either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," as well any "testimony on issues of law." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

Defendant has not explained how Boggess' expertise in engineering and mechanical system failures or his biomechanics work assessing injury risk enables him to opine on which Party originated the Truck specifications, bid on and was accepted as the dealer of the Truck, established the specifications for the Truck, or inspected and tested the Truck.  Moreover, Boggess' expertise clearly does not extend to questions of whether the lack of understanding

about the avoidance system indicates that Neville had a significant lack of communication with EFFD or misrepresented the avoidance system capabilities to EFFD during the procurement process for the Truck and accordingly whether Neville violated its Dealer Agreement by failing to maintain good customer relations.  Furthermore, whether Defendant provided reasonable and acceptable service to EFFD for the Truck and whether Defendant exceeded its responsibilities by upgrading the Truck is outside of Boggess' expertise.  Boggess does not appear to draw these conclusions from any expertise or application of any particular methodology.  (*See* Boggess Aff. Ex. 3.)  While Boggess' expertise in engineering and mechanical system failures or his biomechanics work assessing injury risk enables him to opine on the Truck's construction, functioning, and operation, his expertise does not allow him to opine on issues such as whether Neville failed to maintain good customer, whether Defendant provided reasonable services to EFFD, or which Parties established the specifications for the Truck.  Accordingly, this Court joins many others in excluding such portions of an expert's testimony when that expert testifies outside the scope of his discipline.  *See, e.g.*, *RVC Floor Decor, Ltd.,* 2023 WL 2838423, at *7 ("Although Ramey is qualified to testify about retail and marketing of home furnishings and floor coverings based upon his professional experience, the Court finds that neither his education nor experience qualifies him to offer comparative opinions on the quality of the parties' products."); *Morritt v. Stryker Corp.,* 973 F. Supp. 2d 177, 187–89 (E.D.N.Y. 2013) (holding that "Dr. Montalbano is qualified to testify as Debra Morritt's treating physician about his examination of the polyethylene tibial insert and his medical diagnosis of polyethylene wear" but that any testimony that would "exclude bone cement as an alternative cause of the polyethylene tibial insert's failure" went beyond the scope of his expertise); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result

to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." (emphasis in original)).

"In determining whether an expert's opinion should be excluded as unreliable, 'the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Houser v. Norfolk S. Ry. Co.,* 264 F. Supp. 3d 470, 475 (W.D.N.Y. 2017) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). "An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nimely*, 414 F.3d at 396 (italics omitted) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

"An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel*, 451 F.3d at 127; *see also Smith v. Target Corp.*, No. 10-CV-1457, 2012 WL 5876599, *10 (N.D.N.Y. Nov. 20, 2012) (An expert with experience still must "base[] [his] opinion on sufficient facts or data, and must explain how that experience le[d] to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the

facts[.]" (quotation marks omitted)).  Accordingly, insofar as Boggess seeks to testify as to his conclusions regarding the operation or build of the Truck or its compliance with NFPA protocol—such as the observation that the Truck's hydraulic system and platform leveling system were found to function appropriately—that result from the March 2021 inspection in compliance with NFPA 1911, Standard for the Inspection, Maintenance, Testing, and Retirement of In-Service Emergency Vehicles, he may do so.  *See, e.g., Argonaut Ins. Co. v. Samsung Heavy Indus. Co.,* 929 F. Supp. 2d 159, 166–67 (N.D.N.Y. 2013) ("Daus' reported investigation and the documentation thereof appears to have been conducted in accordance with the professional standards and scientific methodology used by fire investigation experts, which is set forth in NFPA 921."); *Lidle ex rel. Lidle v. Cirrus Design Corp.,* No. 08-CV-1253, 2010 WL 2674584, at *6 (S.D.N.Y. July 6, 2010) (holding expert witness on aerodynamics and aeronautical engineering opinion admissible when largely based on visual inspection).

Plaintiff's argument that Boggess should be excluded because he was unable to answer whether he had previously been qualified to testify as an expert in federal court in any relevant manner, including cases involving a fire truck is not dispositive here.  "[T]here is no requirement that an expert be previously qualified to testify." *Thomas v. YRC Inc.,* No. 16-CV-6105, 2018 WL 919998, at *8 (S.D.N.Y. Feb. 14, 2018); *see also Washington v. Schriver*, 255 F.3d 45, 57 (2d Cir. 2001) (noting that a rule precluding testimony by experts who have never previously qualified as experts in this state would "be illogical because it would preclude any new expert from testifying in New York, no matter what his qualifications and no matter what relevance his testimony has"); *Upstate Jobs Party v. Kosinski*, 559 F. Supp. 3d 93, 124 (N.D.N.Y. 2021) (noting that expert was qualified as an expert despite the fact that he had never "previously appeared as an expert").

34

Furthermore, Plaintiff's contention that that Boggess should be excluded because he was unable to identify 1) if there had been limitations placed on his testimony if he had qualified as an expert, 2) if he was ever tendered as an expert but not accepted, or 3) if he was ever barred from testifying, is belied by the record.  When asked "[w]ere there any limitations placed on your testimony after you qualified as an expert in the cases listed in your report," Boggess responded "I have not been limited from what I would envision myself giving testimony in."  (Def.'s Resp. to Pl.'s 56.1 Ex. Z, at 35:15–19 (Dkt. No. 128-27).)  Additionally, when asked "[w]ere you ever tenured as an expert but not accepted as an expert?" Boggess responded "[n]ot to my knowledge."  (*Id.* at 36:8–10.)  Finally, when asked "[w]ere you ever disqualified to give trial testimony as an expert?" Boggess responded "[n]ot to my knowledge."  (*Id.* at 72:16–18.)

Plaintiff's contention that Boggess is not qualified to testify because he is unfamiliar with Louisiana's redhibition statute is also misguided.  An expert's role, under Federal Rule of Evidence 702(a), is to assist the trier of fact in "understand[ing] the evidence" or "determin[ing] a fact in issue," not to dictate either the facts or the law to the jury.  Fed. R. Evid. 702(a); *see also Scentsational Technologies, LLC v. Pepsi, Inc.*, No. 13-CV-8645, 2018 WL 1889763, at *3 (S.D.N.Y. Apr. 18, 2018) ("[E]xpert testimony may not usurp the province of the judge to instruct on the law, or of the jury to make factual determinations.").

### 2.  Choice of Law

Because "jurisdiction is predicated on diversity of citizenship," the Court "must apply the choice-of-law rules of the forum state."  *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015) (citing, inter alia, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *see also AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) ("At the outset of its analysis, a federal court sitting in diversity jurisdiction applies the choice of law rules of the

forum state.") (alteration and quotation marks omitted).  Under New York's choice-of-law rules, where the parties' briefs assume that a given state's law controls, "such implied consent . . . is sufficient to establish choice of law."  *Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014); *Gabriels Tech. Sols., Inc. v. PNJP, LLC*, No. 17-CV-6410, 2018 WL 11309883, at *2 (S.D.N.Y. Sept. 7, 2018) (same).  Here, Plaintiff and Defendant both apply Louisiana law to Plaintiff's claims, and the Court accordingly concludes that the Parties' implied consent is sufficient to establish Louisiana law as the applicable law for these claims.  (*See generally* Def.'s Mem; Pl.'s Mem.)

Additionally, the Dealer Agreements between Defendant and Neville provide that they "shall be governed, construed, and enforced in accordance with the laws of the State of Louisiana, without regard to its conflict of laws rules."  (Def.'s 56.1 Ex. 7, at 3.)  "Where, as here, the contract[] at issue contain[s] a choice-of-law clause[], the Court applies New York's choice-of-law rules to determine whether and to what extent the parties' contractual choice should be honored."  *EMA Fin., LLC v. NFusz, Inc*., 444 F. Supp. 3d 530, 540 (S.D.N.Y. 2020) (internal quotation marks omitted) (citing *Woodling v. Garrett Corp*., 813 F.2d 543, 551 (2d Cir. 1987)).  "As a general rule, choice of law provisions . . . are valid and enforceable in [New York]."  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000).  Indeed, "it is well settled that New York courts enforce clear and unambiguous choice-of-law contractual provisions so as to effectuate the parties' intent."  *West v. LaserShip, Inc.*, No. 21-CV-5382, 2023 WL 1972216, at *2 (S.D.N.Y. Feb. 13, 2023).  While Neville cites New York law in its Motion for Summary Judgment, it acknowledges in its Reply that the "Dealer Agreements are governed by Louisiana law" and states only that analysis for breach of contract claims are identical under New York and Louisiana law.  (Neville Reply 2.)  Neville "does not object to [D]efendant's application of [Louisiana] contract law."  *United Talmudical Acad. of Kiryas Joel, Inc. v. AP Gas & Elec. (NY),*

*LLC*, No. 15-CV-1666, 2017 WL 4350609, at *4 (S.D.N.Y. May 17, 2017).  Accordingly, "Louisiana law applies to [Defendant's] breach of contract and indemnification claims, which arise directly from the parties' agreement."  *Lynx Tech. Partners, Inc. v. Pitts Mgmt. Assocs., Inc.*, No. 18-CV-3881, 2021 WL 2516111, at *3 (E.D.N.Y. June 6, 2021).

### 3.  Redhibitory Defects

Under Louisiana law, sellers impliedly warrant buyers against redhibitory defects, or vices, in the thing sold.  La. Civ. Code art. 2520.  "A seller is liable to a buyer for a redhibitory defect when: (1) the thing the seller sold is either absolutely useless for its intended purpose or its use is so inconvenient or imperfect that had the buyer known of the defect, he or she would not have purchased it; (2) at the time of the sale, the thing sold contained a defect that was neither known nor apparent to the buyer; and (3) the seller was afforded an opportunity to repair the defect."  *Matter of Crosby Marine Transportation, L.L.C.*, 540 F. Supp. 3d 588, 595 (E.D. La. 2021) (citing *Alston v. Fleetwood Motor Homes of Ind., Inc.*, 480 F.3d 695, 699 (5th Cir. 2007)).  "[A] manufacturer may be directly liable to a building owner for redhibitory defects." *Sw. Louisiana Hosp. Ass'n v. BASF Const. Chems., LLC*, 947 F. Supp. 2d 661, 682 (W.D. La. 2013), *amended* (Sept. 6, 2013).  "The buyer need not prove the underlying cause of the defect, only that it existed."  *Morris v. United Serv. Auto. Ass'n,* 32,528 (La. App. 2 Cir. 2/18/00), 756 So.2d 549, 561.  "The warranty against redhibitory defects covers only defects that exist at the time of delivery."  La. Civ. Code art. 2530.  "There is a presumption that the defect existed at delivery if it manifests within three days of delivery."  *Naquin v. Forest River, Inc*., No. 17-CV-01311, 2018 WL 3147497, at *9 (W.D. La. May 16, 2018), *report and recommendation adopted*, No. 17-CV-01311, 2018 WL 3131058 (W.D. La. June 26, 2018) (citing *id*.).

"A buyer has a duty to inspect the item for defects." *Matter of Crosby,* 540 F. Supp. 3d at 596. "Whether an inspection is reasonable depends on the facts of the case, including such factors as the knowledge and expertise of the buyer, the opportunity for inspection, and the assurances made by the seller." *Id.*; *Lemaire v. Breaux,* 00-1826 (La. App. 5 Cir. 4/11/01), 788 So. 2d 498, 501 (requiring the buyer to conduct an investigation "as would be conducted by a reasonably prudent buyer acting under similar circumstances"). Although the LPLA is the exclusive remedy for damages caused by a product, redhibition claims are preserved to plaintiffs but "only to the extent the claimant seeks to recover the value of the product or other economic loss." *De Atley v. Victoria's Secret Catalogue, LLC*, 2004-0661 (La. App. 4 Cir. 5/14/04), 876 So. 2d 112, 115; *see also NAZ LLC v. Philips Healthcare*, 17-CV-2882, 2018 WL 5847862, at *7 (E.D. La. Nov. 18, 2018) (discussing the LPLA's limiting effect on a redhibition claim, and stating "a plaintiff must bring an action under the LPLA to recover all damages caused by a product, except for damage to the product itself and economic loss sought under the Chapter 9 Redhibition articles").

To establish a prima facie case of redhibitory defect, the buyer has the burden of proving by a preponderance of the evidence that a redhibitory defect existed at the time of the sale. *Morris,* 756 So.2d at 561. Proof of a redhibitory defect may be by direct or circumstantial evidence that gives rise to a reasonable inference that the defect existed. *Id.* (citations omitted). "If the circumstantial evidence excludes other reasonable hypotheses with a fair amount of certainty, [the Plaintiff] has borne his burden of proof." *Custom Metal & Air Conditioning Co. v. Boudreaux*, 346 So.2d 1379, 1380 (La. Ct. App. 1977).

Defendant and Plaintiff both moved for summary judgment on the redhibitory defects claim. (*See generally* Pl.'s Mem.; Def.'s Mem.)

38

a.  Expert Witness

Defendant argues that expert testimony is required to evidence a redhibitory defect. (Def.'s Mem. 3–5.)  The Court notes that this is an unsettled question.  Indeed, courts have held that expert testimony is not necessary to prove a redhibitory defect.  *See, e.g.*, *Hollybrook Cottonseed Processing, LLC v. Carver, Inc.*, No. 09-CV-0750, 2010 WL 1936094, at \*5 (W.D. La. May 12, 2010) ("Existence of a redhibitory defect is a question of fact and need not be proved by expert testimony."); *Com. Union Ins. Co. v. Ryland Dodge & Chrysler, Inc.,* 457 So. 2d 255, 257 (La. Ct. App. 1984) ("A plaintiff need not introduce expert testimony to prove a defective product.").  However, some courts have imposed an expert witness requirement in limited circumstances.  In *Williams v. Janssen Pharms., Inc.*, No. 14-CV-3354, 2016 WL 6127526 (W.D. La. Oct. 20, 2016), the court noted that it:

> has not found any cases directly stating that expert testimony is necessary for a successful redhibition cause of action.  However, most redhibition cases involving products of any complexity involve expert testimony.  If proof of a defect in a product for the purposes of an LPLA cause of action requires expert testimony, it would be illogical to conclude that the same product could be proven defective in a redhibition cause of action without expert testimony.  Thus, the Court concludes that, at least in the context of a redhibition action involving an allegedly defective prescription medication, expert testimony is necessary to prove that the medication is defective.

*Id.* at \*4 (citations omitted).  Additionally, in discussing redhibition and the Louisiana Products Liability Act, the court in *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 15-CV-04127, 2022 WL 326635, at \*3 (E.D. La. Feb. 3, 2022), noted that "[e]stablishing liability, causation, and damages in a products liability claim typically requires expert testimony" and held that the plaintiff's failure to timely designate expert witnesses doomed the claim as they "would need expert testimony" to "establish that defective drywall made by [d]efendants was present in their homes and caused damages."  *Id.* at \*4.

While these cases indicate that in certain redhibition cases, an expert may be necessary to prove a defect, this Court is not convinced that an expert is per se necessary to evidence a defect in the context of a vehicle. *See Magee Motors, Inc. v. Moran,* 393 So. 2d 757, 759 (La. Ct. App. 1980) (noting that, as it pertained to a truck, the plaintiff "need not prove his case by direct or expert testimony. He need only show that the thing failed to perform in the intended manner under conditions of normal use"); *Neck v. Coleman Oldsmobile, Inc.*, 356 So. 2d 532, 533–34 (La. Ct. App. 1977) ("We note at the outset that we are not aware of any rule of law which requires a plaintiff in a redhibition action to prove his claim through the use of expert testimony. On the contrary, the rule has consistently been stated that a buyer need only show that the automobile has failed to perform properly in the manner it was intended to perform under conditions of normal use."). Indeed, in *Mancuso v. Forest River, Inc.*, No. 21-CV-935, 2022 WL 16834554 (E.D. La. Nov. 9, 2022), the court held that plaintiffs' "opposition evidence suggests that a genuine issue of material fact remain[ed] on whether the braking defect is redhibitory" with regard to a purchased motorhome even though the plaintiffs did not rely on expert testimony, indicating that, at the very least, expert witnesses are not required to prove redhibitory defects in the vehicle context. *Id.* at *6.

### b. Specifications

Defendant additionally argues that because the Truck was built in accordance with Plaintiff's specifications, it cannot be held liable under a theory of redhibition. (Def.'s Mem. 16–17.) In support, Defendant cites *Louisiana Industries v. Bogator, Inc.*, 605 So. 2d 213 (La. Ct. App. 1992), however, the facts of that case distinguish it from this Action. In *Louisiana Industries*, a party claiming a redhibitory defect defense ordered cement from a seller and decided to use a new product, Fibermesh instead of wire mesh or steel reinforcement. *Id.* at 215–

16. The concrete developed cracks which resulted in leaks because the purchaser chose to use Fibermesh instead of a watertight membrane. *Id.* Because the redhibition defense stemmed "primarily from [the seller's] inclusion of Fibermesh with the concrete provided," which resulted from the purchaser's "decision to use a relatively new product, Fibermesh, in lieu of standard steel reinforcement," there was no redhibitory defect because where a "seller provides a product in accordance with the plans and specifications provided by the purchaser, the failure of the product to perform in a manner anticipated by the purchaser does not amount to a redhibitory defect." *Id.* at 217. The case is clearly inapposite, Defendant has not argued that the defects at issue—the bucket dropping or ladder rotation issue—are the product of Plaintiff's decision to incorporate a piece of equipment prone to defect into the Truck's design. For instance, Defendant has not argued that Plaintiff requested a nonstandard bucket or ladder or decided not to include a piece of necessary equipment and that the disputed defects resulted from such a choice.

### c. Original Avoidance System

Next, Defendant argues that the original avoidance system is not a redhibitory defect because it was not hidden but instead was apparent by ordinary inspection, did not render the Truck unfit for use, and was replaced at no cost to Plaintiff. (Def.'s Mem. 6–10.) Plaintiff does not dispute this. (*See generally* Pl.'s Opp.) Plaintiff's only reference to the avoidance system in its Opposition is that "Defendant continues to ignore and incorrectly argue that East Fishkill cannot claim redhibitory due to the avoidance system being fixed and operational. The defects in question have not been fixed by the 'functioning' avoidance system, i.e., the bucket still drops unexpectedly and the ladder still malfunctioning inconsistently." (*Id.* at 10.) As Plaintiff has not responded to any component of Defendant's argument that the original avoidance system is not a

redhibitory defect, and in fact appears to concede that the avoidance system is not the defect at issue, any redhibition claim related to the original avoidance system is abandoned. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (finding that claims were deemed abandoned where plaintiff "fail[ed] to argue that they should survive [defendant's] motion for summary judgment" while arguing against the motion as to his other claims); *Bryant v. Steele*, 462 F. Supp. 3d 249, 270 (E.D.N.Y. 2020), *aff'd sub nom. Bryant v. Iheanacho*, 859 F. App'x 604 (2d Cir. 2021) ("A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim.").

### d.  Bucket Dropping and Ladder's Failure to Rotate 360 Degrees

#### i.  Existence of a Defect

Defendant argues that the bucket dropping and ladder's failure to rotate 360 degrees were not redhibitory defects because they did not render the Fire Truck unfit for use.  (Def.'s Mem. 11–16.)  Defendant points to the fact that when Defendant operated the Fire Truck at an inspection in September 2018 and March 2021, it did not find any operational issues including any bucket dropping or the ladder rotation issue and that "Boggess opined that the Fire Truck's hydraulic system and platform leveling system were found to function appropriately, remain level under intended operational status, and hold without excessive drift in a de-energized state." (Def.'s Mem. 11–13.)  However, the Parties agree that members of EFFD have testified that they observed the bucket in a drooped position in the firehouse after it was left alone for a number of hours.  (Neville's Resp. to Def.'s 56.1 ¶ 88.1; Pl.'s Resp. to Def.'s 56.1 ¶ 88.1.)  The bucket drooping would occur over time when the Fire Truck was stowed and parked at the firehouse; the bucket would be level and then hours later or the next day it would be tilted down between five and 15 degrees.  (Neville's Resp. to Def.'s 56.1 ¶ 89.1; Pl.'s Resp. to Def.'s 56.1 ¶ 89.1.)

McNamara testified that he witnessed the drooping some time in 2018.  (Neville's Resp. to Def.'s 56.1 ¶ 90.1; Pl.'s Resp. to Def.'s 56.1 ¶ 90.1.)  DeCrenza, an EFFD volunteer firefighter, testified he was performing the monthly inspection when he claims that the bucket dropped downward.  (Pl.'s Resp. to Def.'s 56.1 ¶ 97.1.)  DeCrenza was operating the lowering level (to lower the aerial) from the turntable; he was looking at the uprights on the cab, and when he looked back up the bucket was dropped downward.  (*Id.* ¶ 98.1.)  The second instance of the bucket allegedly dropping was on August 5, 2019, during Vern Jackson's funeral, when it was outside of the firehouse.  (*Id.* ¶ 99.1.)  Plaintiff argues that "just because the defects did not present themselves during the March 2021 inspection, does not mean that the defects do not exist."  (Pl.'s Opp. 9.)

Defendant additionally argues as to the ladder that there "is no evidence to support [Plaintiff's] claim that the ladder did not rotate 360 degrees," because Geysen and McNamara testified that they were "aware of" complaints concerning the rotation of the ladder but were not aware who made the complaint or when it occurred.  (Def.'s Mem. 14–15.)  Finally, both Parties point to the same email on July 31, 2019 from Tom Smeal (at Smeal) to Rich Rossow (at Ferrara) with a carbon copy to Mike Hansen (at Smeal) that stated:

> The electrical Engineer is Mike Hansen, and I spoke with him awhile ago and he confirmed what I told Drew, that there was not a fix for this spot as it comes from rotation backlash of the turntables. All of the machines that use this rotation system have it and have had it since the beginning. So that being said there is no problem except that the unit can and may stop briefly but can easily be moved slightly and proceed with operations.

Defendant argues this shows there was "<u>no problem</u>" with the ladder's rotation.  (Def.'s Mem. 15.)  Plaintiff responds by arguing that this email demonstrates that the "defects were unable to be repaired."  (Pl.'s Opp. 8.)

Plaintiff argues in its Motion for Summary Judgment that between the time of delivery and the time that the Truck's bucket dropped in August 2019, the Truck was "in for repairs due to its defects approximately [] []24[] times" and that the Truck has approximately 12,000 miles on it, of which 9,000 are related to those defects.  (Pl.'s Mem. 7.)  Plaintiff argues that accordingly, it "[b]y and large" has "not been able to use the [T]ruck that it purchased from Defendant."  (*Id.* at 7–9.)

These facts create a dispute of fact as to whether the bucket dropping and ladder rotation disputed failures were redhibitory defects.  In *Mancuso*, the defendants argued that the plaintiffs had "no evidence to prove that the issues with the brake system . . . constitute redhibitory defects," and pointed "to their expert report, written after a 42-mile test drive, which found the motorhome in very good condition, without any warning lights or braking issues."  2022 WL 16834554 at *6.  However, the court noted that the plaintiff's "opposition reveals the existence of numerous factual issues regarding the existence of the braking system defect, including a video of the motorhome braking on its own and the evidence that technicians attempted to repair the braking system twice during [p]laintiffs' first year of owning the motorhome."  *Id.*  The court ultimately held that the plaintiffs' "opposition evidence suggests that a genuine issue of material fact remains on whether the braking defect is redhibitory."  *Id.*  Somewhat similarly, in *Veluvolu v. Nissan N. Am. Inc.,* No. 18-CV-00197, 2019 WL 2344213 (W.D. La. May 31, 2019) the court held that while it was "uncontested that the Acura has not failed to start since August of 2017" when there were "contrasting pieces of evidence" as to whether the issue had been fully repaired, it could not grant summary judgment for the defendant.  *Id.* at *7.  Indeed, as Plaintiff points out in its Opposition, multiple witnesses testified that they observed the bucket in a drooped position or provided circumstantial evidence that the bucket had dropped—and that the defect did not

44

appear during inspections "does not mean that the defects do not exist."  (Pl.'s Opp. 9; Pl.'s Resp. to Def.'s 56.1 ¶ 88.1.)  While Defendant argues that Plaintiff has not adduced sufficient evidence of the ladder defect, arguing that "[b]eing 'aware of' a complaint, but not knowing of any specific details, and not witnessing it themselves, does not establish a defect" it cites no law in support of this proposition.  (Def.'s Mem. 15.)  As there is dispute as to the existence of a redhibitory defect, namely the bucket dropping or ladder's failure to rotate, summary judgment for either party is inappropriate on that issue.[6]

Defendant additionally argues that Plaintiff continued to use the Fire Truck for years after the first alleged bucket dropping incident and was "used on alarm calls and fire events throughout 2016, 2017, 2018 and 2019, and for training and other non-alarm call events (such as parades and funerals) throughout 2015, 2016, 2017, 2018 and 2019" indicating that any defect was not redhibitory.  (Def.'s Mem. 12.)  Defendant further points out that "Boggess found that the repeated and regular usage of the Fire Truck by EFFD through July 2019 establishes that it was fit for usage or EFFD repeatedly failed to adhere to NFPA 1911."  (*Id.* at 13.)  However, Plaintiff claims that it has been unable to use the Truck on approximately 344 fires "because the [T]ruck is out of service due to defects (i.e. the bucket drops and the ladder cannot rotate and 360° swivel)."  (Pl.'s Opp. 8–9; McNamara Aff. ¶ 13 (Dkt. No. 117).)[7]  Thus, even if Defendant

---

[6] In opposition to Defendant's Motion to Summary Judgement, Plaintiff notes that defects were "not limited to the bucket dropping and the ladder not rotating."  (Pl.'s Opp. 8.)  However, Plaintiff does not explain what other defects it is referring to, and in its statement of facts where it does detail other issues it had with the Truck, it only cites to its complaint.  *Kousnsky v. Pyramid Am., L.P.,* No. 13-CV-9176, 2016 WL 7971722, at *3 (S.D.N.Y. Oct. 26, 2016) (noting that unverified complaints "cannot be relied on as evidence in opposing a summary judgment motion.").  Accordingly, Plaintiff has not presented any evidence of any other defect to oppose Defendant's Motion for Summary Judgement on that claim.

[7] Defendant additionally argues that "there is no evidence that [Plaintiff] took the [F]ire [T]ruck out of service due to the ladder not rotating 360 degrees."  (Def.'s Mem. 15.)  Defendant

45

is right that the Truck has been put to some use, there is a material dispute of fact about whether the Truck was fit to perform in every instance when it was needed.

Defendant argues that the "NFPA 1911 sets forth the grounds for considering the retirement of service of fire apparatus and is specifically focused on the safety of continued use" and that its expert concluded that Plaintiff failed to adhere to NFPA 1911 in determining whether the Fire Truck should be removed from service.  (Def.'s Mem. 13.)  While Defendant argues that its expert's evaluation thus supports the conclusion that "[Plaintiff] has no reasonable basis to assert that the Fire Truck has a safety concern or issue" there is evidence the jury could consider of safety concerns.  (*Id*.)  Indeed, Boggess testified that if the bucket did drop as Plaintiff's witnesses have described, "it could be" a safety concern.  (Def.'s Resp. to Pl.'s 56.1 Ex. Z, at 42:21–24.)

Plaintiff additionally argues that "the first issue with the Truck presented itself in March 2015 and the [T]ruck had numerous other defects from that time onward with varying degrees of severity."  (Pl.'s Mem. 9.)  Plaintiff argues that the Truck's defects are not limited to the "issues with the bucket and ladder" and that the Truck has "had multiple other defects from the date of delivery" which have "caused various problems for East Fishkill, namely safety concerns."  (*Id*. at 10.)  Plaintiff does not identify what defects it claims to be redhibitory aside from the ladder rotation and the bucket dropping and has provided no admissible evidence in support of such other defects.  (*See generally id*.)  While Plaintiff cites to its Amended Complaint in the statement of facts, alleging a series of issues with the Truck, the Court cannot rely on such

---

has produced evidence that Kaye, Palin, and Beyer testified that the only reason the Truck was taken out of service was the bucket dropping issue.  (Def.'s 56.1 ¶ 109.1.)  However, Defendant does not cite to any case standing for the proposition that a plaintiff must cease to use a product because of a defect for that defect to constitute a redhibitory defect.

evidence at summary judgment.  (*Id.* at 2–4.)  *See Bentivegna*, 2017 WL 3394601, at *13 ("[A]n unverified complaint is not admissible evidence."); *Continental Ins. Co,* 2009 WL 1564144, at *1 n.l (finding that on a motion for summary judgment "allegations in an unverified complaint cannot be considered as evidence.").  And confusingly, on the same page that Plaintiff claims that the defects are not limited to the "issues with the bucket and ladder," Plaintiff explicitly states the "redhibitory defects at issue in this case are Truck's bucket dropping and the ladder not rotating 360°."  (Pl.'s Mem. 10.)

As Plaintiff has not pointed to any other defect besides the bucket dropping and the ladder not rotating, and there are fact disputes regarding the existence of those defects, the Court cannot grant Plaintiff summary judgment.  As there is dispute as to the existence of a redhibitory defect, summary judgment for Defendant is also inappropriate on that issue.

### ii.  Opportunity to Repair

Defendant additionally argues that because Plaintiff unilaterally took the Truck out of service and did not allow Defendant to inspect or attempt to repair it, the bucket dropping defect is not redhibitory.  (Def.'s Mem. 12.)   However, Louisiana case law is clear that unlike a seller, "[t]he plaintiff need not give a manufacturer an opportunity to repair a defect in the thing sold." *Dalme v. Blockers Manufactured Homes, Inc*., 2000-00244 (La. App. 3 Cir. 1/25/01), 779 So. 2d 1014, 1028, *writ denied*, 2001-1246 (La. 6/15/01), 793 So. 2d 1248; *Live Oak Homes Corp. v. Carrier Sales & Distribution, LLC*, 13-516 (La. App. 5 Cir. 4/23/14), 140 So. 3d 362, 368 ("[T]he buyer's obligation to tender the product for repair or correction applies only to a good-faith seller but not to a manufacturer, who is presumed to have knowledge of the defects.").

### iii.  At the Time of Sale

"[W]hen a redhibitory defect presents itself more than three days after purchase, a Plaintiff must either provide evidence that the defect existed at the time of sale or there must be a lack of evidence supporting the possibility of intervening cause of the defect." *Arant v. Wal-Mart Stores, Inc.*, No. 13-CV-2209, 2015 WL 1419335, at *6 (W.D. La. Mar. 26, 2015), *aff'd*, 628 F. App'x 237 (5th Cir. 2015); *see also Sweeny v. Vindale Corp.,* 574 F.2d 1296, 1300 (5th Cir. 1978) ("[E]ven if the defect appears more than three days after the sale, a reasonable inference may arise, in the absence of an intervening cause or other explanation, that the defect existed at the time of sale."); *Dixie Roofing Co. of Pineville, Inc. v. Allen Par. Sch. Bd*., 95-1526 (La. App. 3 Cir. 5/8/96), 690 So. 2d 49, 55, *writ denied*, 96-2084 (La. 11/8/96), 683 So. 2d 276, *and writ denied*, 96-2100 (La. 11/8/96), 683 So. 2d 277 ("In proving that the defect existed at the time of sale, a reasonable inference may arise, in the absence of an intervening cause or other explanation, that the defect existed at the time of the sale.").  Accordingly, "in the absence of other explanations, later appearing defects may be inferred to have pre-existed the sale, when such defects do not usually result from ordinary use." *Rhodes v. All Star Ford, Inc.,* 599 So. 2d 812, 814 (La. Ct. App. 1992); *see also Dailey v. The Home Furnishings Store*, 2002-1225 (La. App. 4 Cir. 9/17/03), 857 So. 2d 1051, 1056 ("Later-appearing defects do not enjoy that status as a matter of law, but in the absence of other explanation, defects which do not usually result from ordinary use for the time passed may be inferred to have pre-existed the sale.").

The Parties dispute whether the bucket dropping and Ladder's failure to rotate 360 degrees existed at the time of sale.  Defendant argues that the bucket dropping and ladder's failure to rotate 360 degrees were not redhibitory defects because they did not exist at the time of sale.  (Def.'s Mem. 10–15.)  In particular, Defendant claims that the defects did not appear

48

within three days' time, that the first instance of the bucket allegedly dropping was in November 2016, almost two years after the delivery of the Fire Truck, and that the ladder rotated 360 degrees when delivered.  (*Id.*)  Plaintiff responds that while the Truck had 12,000 miles on it in total, only 3,000 of those miles pertained to Plaintiff's actual intended use of the Truck, and that, therefore, "it is hard to imagine how [D]efendants could assert that East Fishkill is the cause of the bucket dropping or the ladder failing to rotate [] 360°."  (Pl.'s Opp. 10.)

Defendant has not addressed the intervening cause issue in its briefing regarding the existence of a defect at the time of sale.  (*See generally* Def.'s Mem.)  Defendant's statement that its expert "concluded that [Plaintiff] failed to adhere to NFPA 1911 in its maintenance" is not made in reference to its argument that the bucket dropping did not exist at the time of sale.  (Def.'s Mem. 13.)[8]  Regardless, Defendant has not explained what it means for Plaintiff to have failed to adhere to NFPA 1911 in its maintenance, nor has it explained how Plaintiff failed to maintain the Truck and whether any failure in maintenance would constitute an intervening cause here.  As the Court cannot conclude from Defendant's briefing that there is an alternative explanation for or intervening cause responsible for the defect, later appearing defects can be inferred to have pre-existed the sale.  *See LeBlanc v. Mercedes-Benz of N. Am., Inc.*, 633 So. 2d 399, 403 (La. Ct. App.), *writ denied,* 94-1225 (La. 7/1/94), 639 So. 2d 1169 (finding "no error in the jury verdict granting a rescission of the sale" in a redhibition case "considering the lack of any intervening cause").[9]  Accordingly, summary judgment is not warranted on this ground.

---

[8] While Defendant notes in its 56.1 Statement that Plaintiff failed to keep the Truck in a temperature-controlled room, it does not raise this argument in its briefing.

[9] Defendant notes that:

It is unclear whether EFFD plans to argue that the height of the Fire Truck or the late delivery were redhibitory defects. If EFFD makes either argument, it is

As neither Plaintiff nor Defendant has shown there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law on the redhibition claim, the Court denies summary judgment on that claim to both Parties.

### 4.  Breach of 2014 Apparatus Contract

Defendant and Plaintiff entered into a 2014 Apparatus Contract for the Truck.  (Neville's Resp. to Def.'s 56.1 ¶ 26.1; Pl.'s Resp. to Def.'s 56.1 ¶ 26.1.)  Defendant argues that Plaintiff's breach of contract claim cannot survive alongside its redhibition claim.  (Def.'s Mem. 17–18.)  Plaintiff argues that it can plead the breach of contract claim in the alternative.  (Pl.'s Opp. 12.)  The Court agrees that Plaintiff's breach of contract claim cannot survive.

In *Hollybrook Cottonseed Processing, LLC v. Carver, Inc*., No. 09-CV-0750, 2010 WL 892869 (W.D. La. Mar. 11, 2010), the court held that only "in the limited circumstances where a buyer sues a manufacturer for economic damages not covered in redhibition and not caused by the product itself, [] may [it] bring a breach of contract claim for those damages, on its own or in addition to a claim for other damages under the LPLA or redhibition."  *Id.* at *7.  Accordingly, when "the source of damage is not the product itself but, for instance . . . a failure to provide services in breach of a contract separate and apart from the contract of sale, a plaintiff may bring this distinct claim alongside or independently."  *NAZ, LLC v. Philips Healthcare, a Div. of Philips Elecs. N. Am. Corp.*, No. 17-CV-2882, 2018 WL 1202570, at *8 (E.D. La. Mar. 8, 2018).

---

disingenuous at best given that the height of the Fire Truck and the late delivery never made the Fire Truck unfit for use. Both issues were resolved at delivery and the Fire Truck was in use for five years afterwards.

(Def.'s Mem. 14.)  Plaintiff has not responded to this argument.  (*See generally* Pl.'s Opp.)  Such a claim is therefore abandoned.  *See Kovaco*, 834 F.3d at 143 (finding that claims were deemed abandoned where plaintiff "fail[ed] to argue that they should survive [the defendant's] motion for summary judgment" while arguing against the motion as to his other claims).

Plaintiff has not argued that its breach of contract cause of action falls within the *Hollybrook* exception, indeed it argues the opposite: that its "cause[] of action for breach of contract . . . [is] not meant to seek an award of damages in addition to any award recovered by [Plaintiff] via the redhibition claim." (Pl.'s Opp. 12.) Accordingly, the Court grants Defendant summary judgment on Plaintiff's breach of contract claim. *NAZ, LLC*, 2018 WL 1202570, at *8 (holding that "when damage is caused by the product . . . the LPLA has precluded claims for breach of contract"); *Hollybrook Cottonseed Processing, LLC*, 2010 WL 892869, at *7 (observing that, "[t]o the extent Hollybrook claims damages caused by the allegedly defective equipment, its breach of contract claims are subsumed by the LPLA," and granting the defendant's motion for summary judgment); *cf. C-Innovation, LLC v. Norddeutsche Seekabelewerke GMBH*, No. 10-CV-4441, 2013 WL 990026, at *6 (E.D. La. Mar. 13, 2013) ("The economic damages C–Innovation is seeking are not by virtue of an action in redhibition and are not caused by the product itself. Thus, C–Innovation may bring a claim for breach of contract based fraud, on its own or in addition to a claim under the LPLA or redhibition."); *Jack B. Harper Contractor, Inc. v. United Fiberglass of Am., Inc.*, No. 11-CV-20, 2012 WL 2087394, at *2 (E.D. La. June 8, 2012) (denying summary judgment due to "an issue of fact as to whether Harper's claims fall solely within the LPLA").

### 5. Unjust Enrichment

"A person who has been enriched without cause at the expense of another person is bound to compensate that person." La. Civil Code art. 2298. A prerequisite for maintaining a claim for unjust enrichment is that the plaintiff have no other available remedy. *See id.* ("The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule."); *see also Creely v. Leisure Living, Inc.*, 437

So.2d 816, 822 (La. 1983) ("There must be no other remedy at law available to the plaintiff.").

As Defendant rightfully notes, because Plaintiff has a redhibition cause of action, the unjust

enrichment claim cannot survive. *See In re Vioxx Prod. Liab. Litig.,* No. 05-CV-3700, 2010 WL

11570867, at *14 (E.D. La. Mar. 31, 2010) ("[E]ven if Plaintiff's redhibition claim ultimately

fails, an unjust enrichment claim would still be precluded . . . [as] . . . it is not the success or

failure of other causes of action, but rather the existence of other causes of action, that determine

whether unjust enrichment can be applied") (citation omitted); *Marseilles Homeowners Condo.*

*Ass'n, Inc. v. Broadmoor, L.L.C.*, 2012-1233 (La. App. 4 Cir. 2/27/13), 111 So. 3d 1099, 1105

(holding that when a redhibitory defect was pled, such "a pleading in and of itself precludes

recovery under a claim of unjust enrichment").

### 6.  Breach of 2014 Dealer Agreement

Defendant and Neville both move for summary judgment on the breach of contract claim.

(*See generally* Def.'s Neville Mem.; Neville Mem.)[10]

To state a claim for breach of contract under Louisiana law, a plaintiff must prove:

"(1) the obligor's undertaking of an obligation to perform, (2) the obligor failed to perform the

obligation (the breach), and (3) the failure to perform resulted in damages to the obligee."

---

[10] The Court notes that Neville has relied on New York law in its Motion. (*See generally* Neville Mem.)  Defendant argues that summary judgment should be denied on that basis alone. (Def.'s Neville Opp. 2–3.)  As Neville correctly notes, "breach of contract claims in New York and Louisiana require plaintiffs to establish essentially the same elements." *Lynx Tech. Partners*, 2021 WL 2516111, at *3.  To recover on a breach of contract claim under New York law, the plaintiff must establish "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). Similarly, the elements of such a claim under Louisiana law are "(1) the obligor undertook an obligation to perform, (2) 'the obligor failed to perform the obligation,' and (3) 'the failure to perform resulted in damages to the obligee.'" *Helpful Hound, L.L.C. v. New Orleans Bldg. Corp.*, 331 F. Supp. 3d 581, 602 (E.D. La. 2018).  Thus, the Court will not deny Neville's Motion on this ground.

*Thomas v. Allstate Ins. Co*., No. 21-CV-1019, 2022 WL 15654249, at *2 (E.D. La. Sept. 29, 2022) (citation omitted).  "A party asserting a breach of contract must specify the contractual provisions allegedly breached."  *Id*.; *see also Grand Isle Shipyards, Inc. v. Black Elk Energy Offshore Operations, LLC*, No. 15-CV-129, 2021 WL 673449, at *3 (E.D. La. Feb. 22, 2021) ("It is black-letter law in Louisiana that a party asserting a breach of contract must prove a breach of a specific contractual provision.").

      "Interpreting a contract is a matter of determining the parties' common intent."  *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 298 (5th Cir. 2019) (citing La. Civ. Code art. 2045) "[W]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  *Apache Deepwater, LLC v. W&T Offshore, Inc*., 930 F.3d 647, 656 (5th Cir. 2019) (quotation marks and alterations omitted).  This rule "does not allow the parties to create an ambiguity where none exists and does not authorize courts to create new contractual obligations where the language of the written document clearly expresses the intent of the parties."  *Omnitech Intern., Inc. v. Clorox Co.*, 11 F.3d 1316, 1326 (5th Cir. 1994).  Additionally, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."  La. Civ. Code art. 2050.

      "Whether contract language is ambiguous under Louisiana law is a question of law."  *Apache Deepwater, L.L.C. v. W&T Offshore, Inc.*, 930 F.3d 647, 656 (5th Cir. 2019).  Under Louisiana law, a contract is ambiguous when the contract is "uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction."  *Shockle v. Massachusetts Mut. Life Ins. Co*., 369 F.3d 437, 440 (5th Cir. 2004); *see also Greenwood 950, L.L.C. v. Chesapeake La., L.P*., 683

F.3d 666, 668 (5th Cir. 2012) ("[A] contract is ambiguous when, *inter alia*, its 'written terms are susceptible to more than one interpretation,' when 'there is uncertainty as to its provisions,' or when 'the parties' intent cannot be ascertained from the language used.'").  When a contract is ambiguous, "the agreement shall be construed according to the intent of the parties."  *Guidry v. American Public Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007).

"A doubtful provision must be interpreted 'in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.'"  *Greenwood 950, L.L.C.*, 683 F.3d at 669 (quoting La. Civ. Code art. 2053).  "According to the Civil Code, equity 'is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another,' and usage is 'a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation.'"  *Id.* at 669 n.13 (italics omitted) (quoting La. Civ. Code art. 2055).  Additionally, "nontechnical words in a contract must be given their generally prevailing meaning, and each contract provision must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."  *Id.* at 669 (citing La Civ Code arts. 2047, 2050).

"If an ambiguity remains after applying the other general rules of construction, then the ambiguous contractual provision is to be construed against the drafter."  *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 298 (5th Cir. 2019) (citation omitted).[11]

"If the court determines that there is an ambiguity, the question of intent is an issue of fact."  *Apache Deepwater, L.L.C.,* 930 F.3d at 657.  "Intent is an issue of fact which is to be

---

[11] No Party in its 56.1 Statement has informed the Court which Party drafted the Dealer Agreement at issue.

inferred from all of the surrounding circumstances." *Guidry*, 512 F.3d at 181 (emphasis

omitted); *see also Liberty Mut. Ins. Co. v. Pine Bluff Sand & Gravel Co.*, 89 F.3d 243, 246 (5th

Cir. 1996) ("[A]mbiguity in the terms of a contract gives rise to a fact question concerning the

intent of the parties.").

Defendant argues that Neville breached the Dealer Agreement's contractual provision

that Neville shall "[a]ctively represent and promote the sales of [Ferrara's] apparatus in

[Neville's] territory and maintain good customer rapport."  (Def.'s Mem. 21–23; Def.'s 56.1 ¶ 4.)

Defendant specifically argues that Neville failed to maintain good customer rapport with

Plaintiff, pointing to the communication issues that Heidrich had with Plaintiff during the build

process for the Truck and his alleged misrepresentation of the avoidance system and the

compartment space availability on the Fire Truck.  (Def.'s Mem. 21–23.)  Neville responds that

it did not breach the Dealer Agreement because it procured all insurance policies required by the

Dealer Agreement, made no misrepresentations concerning the Fire Truck's operation, and

maintained a good customer rapport with Plaintiff throughout the sale of the Truck.  (Neville

Mem. 3–10.)

Defendant points to a series of communications it argues demonstrates beyond dispute

the lack of good customer rapport.  (Def.'s Mem. 21–23.)  On October 7, 2014, Kaye, wrote to

Heidrich: "Just a heads up, the Chairman of the Board is not happy.  We haven't heard back from

you in almost two weeks regarding the travel dates, bell and updated pictures on-line.  He is

seriously considering going to the Board and recommending termination of the contract with

Neville Apparatus."  (Neville's Resp. to Def.'s 56.1 ¶ 79.1; Pl.'s Resp. to Def.'s 56.1 ¶ 79.1.)

On October 23, 2014, McClellan wrote to Heidrich: "John, Kathe has been trying to e-mail you.

Is all good? She is VERY CONCERNED, please call her or write!"  (Neville's Resp. to Def.'s

56.1 ¶ 80.1; Pl.'s Resp. to Def.'s 56.1 ¶ 80.1.)  On December 17, 2014, Kaye wrote to Neville's

owners and sent them several examples of Heidrich emails to help them "understand the

frustration we have had in dealing with John."  (Neville's Resp. to Def.'s 56.1 ¶ 81.1; Pl.'s Resp.

to Def.'s 56.1 ¶ 81.1.)  On January 2, 2015, McClellan wrote to members of EFFD: "I just

received a call from our sales person, JOHN, he started asking for information on who has all the

change orders? . . . I WOULD SUGGEST THAT WE DO NOT DEAL WITH OUR PAST

SALESPERSON ONLY THE TWO OWNERS OF NEVILLE."  (Neville's Resp. to Def.'s 56.1

¶ 82.1; Pl.'s Resp. to Def.'s 56.1 ¶ 82.1.)  On January 3, 2015, one of Neville's owners, Robert

Radecki, admitted that Neville had communications issues: "From what I have seen to this point

there clearly have been communication issues. I cannot repair those particular issues, I can only

promise to work as diligently as I have been to achieve my original goal."  (Neville's Resp. to

Def.'s 56.1 ¶ 83.1; Pl.'s Resp. to Def.'s 56.1 ¶ 83.1.)

Neville argues that "the evidence in the record demonstrates that Neville's owners

expended great effort to ensure [Plaintiff's] customer satisfaction."  (Neville Reply Mem. 4.)

Neville points to the affidavit of Paul Gurney, vice president of Neville, who stated:

> Mr. McClellan of EFFD appears to have become frustrated with Neville's
> salesperson, John Heidrich, in part due to a two-week period in October 2014
> when Mr. Heidrich was on vacation and failed to respond to EFFD as quickly as perhaps
> Mr. McClellan wanted. Regardless, Neville continued to maintain a good
> relationship with EFFD. As late as January 2015, mere weeks before delivery of
> the Firetruck to EFFD, while Mr. McClellan suggested that EFFD cease dealing
> with Mr. Heidrich, he also suggested that EFFD instead speak directly to me or
> Robert Radecki, the co-owner and President of Neville.

(Gurney Moving Aff. ¶ 19 (Dkt. No. 126).)  Neville also points to an email from

McClellan that states "I WOULD SUGGEST THAT WE DO NOT DEAL WITH OUR

PAST SALESPERSON ONLY THE TWO OWNERS OF NEVILLE."  (Gurney Moving

Aff. Ex. O (Dkt. No. 126-1).)  Additionally, in response to an email from Plaintiff

expressing disappointment and frustration regarding the late delivery of the Truck,

Neville replied:

> Chief, I share and understand you're [sic] frustration and disappointment. Unfortunately I became active in this delivery the week before Christmas. My first objective was to obtain complete and total satisfaction regarding the open issues presented and deliver this truck to you in a timely fashion. From what I have seen to this point there clearly have been communication issues. I cannot repair those particular issues, I can only promise to work as diligently as I have been to achieve my original goal. We worked tirelessly through the holidays to ensure we could meet the promised delivery date of 1/3/15 and correct all the issues. I provided a detailed punch list of what was required to ensure the delivery could take place. 1 have been in constant communication with the department regarding the delivery to ensure we had no issues regarding acceptance and delivery scheduled. This changed the beginning of this week, when I submitted the final invoice along with invoices for the changes / modifications performed above and beyond the original purchase price. Apparently upon my forwarding these documents to the department there appears to be a substantial discrepancy in the total final purchase price. I did discuss rescheduling the delivery with Bill McClellan Friday as we could not achieve a resolve [sic] but this is still not solidified. Due to the holidays the key personnel on both sides involved in these questioned change orders were unable to provide the essential required documentation to rectify this. Please understand on behalf of Neville Apparatus Paul, John and Myself we are equally disappointed this delivery has taken such a tumultuous course. We completed the provided punch list within the time fame promised and had all intentions of delivering this vehicle today 1/3/15. This truck is completed clean, prepped and ready for delivery as soon as the final invoice and change orders can be finalized. At this time I am uncertain of which direction we are going to proceed. During my discussion with Bill he stated that Kathe will be understandably extremely busy the beginning of next week and would be unable to provide the change orders / clarifications until later in the week, I can appreciate this. On my end my research has led me to believe the Invoice & change order submitted on 12/31/14 was current and accurate. Bill and myself were both in agreement these issues need to be addressed prior to delivery. At this time the vehicle is ready for delivery and eagerly await a resolve, I truly wish to finalize this and deliver this truck as soon as we can so the department can receive this excellent apparatus and start utilizing it to protect the community. I am available 24/7 and look forward to any suggestion which can rectify this situation and bring this to a quick resolve.

(Def.'s 56.1 Ex. OO (Dkt. No. 112-42).)

First and foremost, the phrase "maintain good customer rapport" is not precise or

unambiguous.  As Neville rightfully notes, the "agreements do not define the phrase and provide

no context for what it means" and the standard is "nebulous."  (Neville Mem. 4–5.)  Defendant argues that "[i]t cannot seriously be argued that there are different meanings of 'good customer rapport'" and notes that the generally prevailing meaning of 'rapport' is 'a close and harmonious relationship in which the people or groups concerned understand each other's feelings or ideas and communicate well.'"  (Def.'s Reply Mem. 2–3 (citing www.dictionary.com/rapport.).)  However, the linked website that Defendant provides is inactive.  Merriam-Webster defines rapport as "a friendly, harmonious relationship *especially***:** a relationship characterized by agreement, mutual understanding, or empathy that makes communication possible or easy."  *See rapport,* www.merriam-webster.com, https://www.merriam-webster.com/dictionary/rapport#:~:text=%3A%20a%20friendly%2C%20harmonious%20relationship,makes%20communication%20possible%20or%20easy (last visited May 3, 2023).  The Cambridge dictionary defines rapport as "a good understanding of someone and an ability to communicate well with them."  *See rapport,* dictionary.cambridge.org, https://dictionary.cambridge.org/us/dictionary/english/rapport (last visited May 3, 2023).  The Court cannot ascertain what precisely the Parties to the Dealer Agreement intended by the term "good customer rapport" and what would qualify as an ability to communicate well or a harmonious relationship.  As the Fifth Circuit has held "when a contract is ambiguous, the trier of fact must resolve the factual issue of intent, and judgment on the pleadings or summary judgment is improper," accordingly, summary judgment on the issue of breach is improper here. *Guidry*, 512 F.3d at 181 (finding that dismissal on the pleadings was error when the contract at issue was ambiguous) (citation omitted); *see also Liberty Mut. Ins. Co.*, 89 F.3d at 246 ("[A]mbiguity in the terms of a contract gives rise to a fact question concerning the intent of the parties."); *Gertler v. City of New Orleans*, 2003-2131 (La. App. 4 Cir. 9/1/04), 881 So. 2d 792,

796, *writ denied*, 2004-2649 (La. 1/7/05), 891 So. 2d 687 ('If the language of [a contract] is ambiguous or susceptible to multiple interpretations, the intent of the parties must be determined and summary judgment is inappropriate.").

Furthermore, there are material disputes of fact regarding any misrepresentation of the avoidance system. Defendant argues that Heidrich's misrepresentation of the avoidance system constituted a breach of the provision requiring the maintenance of good customer rapport. (Def.'s Mem. 20–23.) In particular, Defendant posits that "[m]ultiple EFFD witnesses testified that Heidrich misrepresented the type of avoidance system that would be installed on the Fire Truck." (*Id*. at 24; Def.'s 56.1 ¶ 61.1.) Neville responds that "[n]one of these witnesses [cited by Defendant for this proposition] recalled any specific misrepresentations made by Heidrich." (Neville's Resp. to Def.'s 56.1 ¶ 61.1.) McClellan testified that Heinrich "specifically told us that there's avoidance system, it's state of the art. And at the time he didn't indicate that Smeal was putting the ladder or the avoidance system on as a subcontractor." (Def.'s 56.1 Ex. D, at 88.) EFFD personnel testified that they had the "impression" that the "ladder would go lower than it was actually capable of going." (Def.'s 56.1 Ex. L, at 40–41.) Palin testified that Heinrich told him "that the avoidance system would have more safety zones than it did have." (Def.'s 56.1 Ex. Y, at 25.) Uzzolino testified that he understood that Plaintiff was not "happy with the limitations of the standard collision avoidance system and they were under the belief that it would work beyond the way that system was designed," and that Plaintiff claimed the limitations of the avoidance system were never "fully explained." (Def.'s 56.1 Ex. AA, at 19:18–21, 63:4–15.) Finally, an email signed by Ehrhart, stated "if it weren't for a ladder protection system that a former salesman misrepresented, the rest of the things were just business as usual." (Def.'s 56.1 Ex. Z.)

Neville argues that none of these witnesses "testified to any specific misrepresentation" and, citing to Heidrich's affidavits, argues that Heidrich never made a misrepresentation. (Neville Opp. 10.)  In his moving affidavit, Heidrich affirmed:

> At no point did I ever misrepresent the functionality of the cab avoidance system to EFFD. I informed EFFD that the Fire Truck would contain a cab avoidance system, which it did. The cab avoidance system installed in the Fire Truck was the only cab avoidance system sold by Ferrara at that time. At no point did I tell EFFD that a specific cab avoidance system would be installed. Moreover, at the Pre-Delivery Meeting, Neville and Ferrara reviewed with EFFD the precise specifications and parameters for the Fire Truck. As part of the demonstration of the Fire Truck, EFFD representatives, including Mr. McClellan, observed the aerial apparatus and the cab avoidance system and noted no shortcomings or deficiencies with it.

(Heidrich Moving Aff. ¶ 30 (Dkt. No. 124).)  Heidrich also affirmed that "[d]uring the Pre-Delivery Meeting, the Fire Truck was demonstrated for [Plaintiff].  At this time, I discussed the cab avoidance system with [Plaintiff] and explained that it worked within the parameters set by the factory for how close the ladder would come to the cab of the Fire Truck.  At no point did I tell EFFD that the aerial could operate in a way irrespective of these factory-set parameters." (*Id*. ¶ 20.)  Heidrich additionally affirmed that it was "my understanding that one member of the EFFD claimed that the aerial system should have been able to curve around obstacles. I never represented that the aerial system that they ordered could maneuver in that manner.  EFFD never told me that they needed the aerial to operate in that manner and I would never assume that a fire department would require the aerial system to operate in such a way."  (Heidrich Opp. Aff. ¶ 2 (Dkt. No. 142).)[12]

---

[12] Plaintiff agrees that it wanted an avoidance system that would carve around the obstacles, meaning that is soon as it got past an obstacle there would be more functionality and a more robust operating envelope.  (Pl.'s Resp. to Def.'s 56.1 ¶ 65.1.)

"Even a self-serving affidavit can establish a genuine dispute of fact so long as the affidavit does not contradict the witness's prior testimony." *Dye v. Kopiec,* No. 16-CV-2952, 2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016) (citing *Hayes v. N.Y.C. Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.")); *see also Brown v. Reinauer Transp. Co., L.P.,* 788 Fed. App'x. 47, 49 (2d Cir. 2019) (holding that a party may create an issue of fact by submitting an affidavit in opposition to a summary judgment motion where the "'issue was not fully explored in the deposition, or the deponents' responses were ambiguous'").[13] Furthermore, Neville's contention that there is no evidence of a misrepresentation is controverted by the deposition testimony cited by Defendant—for instance Palin testified that Heinrich told him "that the avoidance system would have more safety zones than it did have." (Def.'s 56.1 Ex. Y, at 25.) Accordingly, there is a dispute of fact as to whether Heidrich misrepresented the capacity of the avoidance system.[14]

---

[13] A declaration cannot be "rendered insufficient merely because it is self-serving. In fact, to disregard a declaration on that basis alone would amount to a credibility determination that is reserved for the trier of fact, not the Court on summary judgment." *Corbett v. City of New York,* No. 15-CV-09214, 2017 WL 3207783, at *1 (S.D.N.Y. July 27, 2017) (citing *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 57 (2d Cir. 1998) ("To hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off summary judgment would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits."); *see also Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 38 (2d Cir. 1994) ("It is not the province of the summary judgment court itself to decide what inferences should be drawn.")). The Second Circuit has recognized that, in "rare circumstance[s]," a district court may properly disregard self-serving testimony at the summary judgment stage where "it is so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit" it. *Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir. 2005) (quotation marks omitted). No such circumstances are present here.

[14] Neville additionally makes a series of arguments regarding negligent misrepresentation. Neville appears to be arguing it is entitled to summary judgment because

61

Neville argues that there is "no evidence in the record that [Plaintiff's] rapport with Neville in any way damaged [Defendant's] own relationship with [Plaintiff]" and that Defendant has failed to demonstrate that it suffered any injury as a result of these communication issues. (Neville Mem. 10; Neville Opp. 6–7.)  Neville specifically argues that the evidence reflects that EFFD's good rapport with Ferrara continued long after the sale and delivery of the Fire Truck. (Neville Mem. 10.)  For instance, by letter dated August 26, 2015, Plaintiff wrote to Chris Ferrara, the President of Ferrara, to thank him "for all of [his] assistance with the purchase of [EFFD's] ladder truck," and also extended a "personal thank you to Ms. LaDonna and Nick Uzzolino [of EFFD] for their unending diligence in resolving the District's truck issues."  (Def.'s 56.1 ¶ 76.1.)  In addition, in November 2015, Ehrhart sent an email to Geysen, copying McClellan, chairman of the EFFD Board of Fire Commissioners at the time, noting that "in the grand scope," the issues with the Fire Truck "are not big issues and nothing more than we could have expected from any other manufacturer."  (Neville's Resp. to Def.'s 56.1 ¶ 124.1; Pl.'s Resp. to Def.'s 56.1 ¶ 124.1.)  Defendant argues that it has suffered damage as the result of Neville's breach of the rapport clause—namely that Neville was responsible for Plaintiff's "initial dissatisfaction with the fire truck" and that it has incurred damage, namely the instant lawsuit and the fact that it paid for a new avoidance system at its own cost.  (Def.'s Neville Reply Mem. 1, 7.)

---

Defendant cannot sustain a cause of action against Neville based on an alleged misrepresentation made to Plaintiff and notes that Plaintiff's complaint does not allege any misrepresentation or state a claim for relief against Defendant based upon misrepresentations.  (Neville Opp. 7–9.) Neville's arguments are misguided—Defendant's argument is that the alleged misrepresentation was a breach of "good customer rapport" provision of the Dealer Agreement—it has not brought a fraud claim against Neville.  (Def.'s Neville Opp. 8.)

"[P]roof of damages is an essential element to a breach of contract claim."  *CIT Bank,*

*N.A. v. Howard Transportation, Inc.,* No. 17-CV-10767, 2020 WL 3047436, at *2 (E.D. La. June

8, 2020) (citation omitted).  "The party bringing suit has the burden of proving any damage

suffered by it as a result of a breach of contract."  *Id.*  Under Louisiana law, breach of contract

"[d]amages are measured by the loss sustained by the obligee and the profit of which he has been

deprived."  *Id.*  Because there is a dispute of fact as to whether Neville breached the "good

customer rapport" provision of the Dealer Agreement through any misrepresentation of the

functionality of the avoidance system, this Court cannot determine at summary judgment

whether Defendant's injuries related to the avoidance system—namely the expense it occurred to

replace the system—were caused by Neville's breach.

Neville additionally argues it should be awarded summary judgment on Defendant's

breach of contract claim as it relates to its procurement of insurance.  (Neville Mem. 3–5.)

Neville argues in its Motion for Summary Judgment that it procured and maintained the proper

insurance coverage because the Dealer Agreements *only* required Commercial General Liability

insurance "for personal injury, bodily injury and property damage."  (*Id.* at 4–5.)  Neville then

argues that Plaintiff's claims against Defendant "plainly fall outside of the insurance required by

the dealer agreements," and therefore "Neville's compliance with the dealer agreements (or lack

thereof) is immaterial to [Defendant's] exposure liability for [Plaintiff's] claims."  (Neville

Reply Mem. 3.)  The relevant text reads:

> The Distributor must procure and maintain Commercial General Liability
> Insurance on an occurrence basis with limits of no less than $1,000,000 per
> occurrence combined single limit for personal injury, bodily injury and property
> damage.  Coverage shall include premises liability, products/completed operations,
> independent contractors, blanket contractual and name Manufacturer as an
> additional insured.

(Def.'s 56.1 Ex. G.)  Defendant argues that Neville's reading "wholly ignores the remainder of its requirements for procuring and maintaining commercial general liability under the dealer agreements," which also require that the Commercial General Liability insurance coverage "shall include premises liability, products/completed operations, independent contractors, blanket contractual and name Manufacturer as an additional insured."  (Def.'s Neville Opp. 3–4.)  Neville responds that "coverage of 'products/complete operations' or 'blanket contractual' under the insurance policy becomes relevant only after a threshold determination that the policy is triggered by a personal injury, bodily injury, or property damage, none of which occurred here." (Neville Reply 3.)

It is not clear to the Court from the dealer agreement that "Commercial General Liability" was required only for personal injury, bodily injury and property damage.  It is clear that the $1,000,000 minimum applied solely to personal injury, bodily injury and property damage coverage but not that the Commercial General Liability as a whole was limited to personal injury, bodily injury and property damage.  Accordingly, summary judgment is not warranted.[15]

---

[15] Defendant's third-party complaint against Neville includes claims for contractual indemnification, common-law indemnification, and contribution for the damages alleged by Plaintiff.  (Dkt. No. 34.)  Neville filed a counterclaim against Defendant on January 18, 2021 for contractual indemnification, common-law indemnification, and contribution.  (Dkt. No. 44.) Because Plaintiff's only remaining claim against Defendant—redhibition—is predicated upon the disputed bucket dropping and the ladder's failure to rotate defects which, unlike avoidance system, Neville is not alleged to have had a role in, the Court dismisses these claims.  *See Matter of Aries Marine Corp.*, No. 19-CV-10850, 2023 WL 1768361, at *9 (E.D. La. Feb. 3, 2023), *reconsideration denied*, No. 19-CV-10850, 2023 WL 3055530 (E.D. La. Apr. 24, 2023) (holding that because the defendant/third-party plaintiff "has already been found free of fault and its arguments regarding entitlement to indemnification for any claims asserted by the claimants are therefore moot"); *see also Trafalgar Power, Inc. v. U.S. Bank Nat. Ass'n*, No. 05-CV-1533, 2012 WL 555044, at *12 (N.D.N.Y. Feb. 21, 2012), *aff'd sub nom. Christine Falls Corp. v. U.S. Bank*

III.  Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment against Plaintiff is granted in part and denied in part, Defendant's Motion for Summary Judgment against Neville is denied, and Neville's Motion for Summary Judgment against Defendant is denied.  Defendant's Motion for Summary Judgment against Plaintiff is granted as to Plaintiff's breach of contract and unjust enrichment claim.  Defendant's Motion for Summary Judgment against Plaintiff is denied for the redhibition claim, which survives as to the alleged bucket dropping and ladder's failing to rotate 360 degrees.  Defendant and Neville's claims for indemnification and contribution are dismissed as moot.

The Court will hold a conference in this case on October 10, 2023 at 11:00 A.M.  The Clerk of Court is respectfully directed to terminate the pending Motions (Dkt. Nos. 105, 110, 111, 121.)

SO ORDERED.

Dated:     September 28, 2023
           White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

---

*Nat. Ass'n*, 546 F. App'x 13 (2d Cir. 2013) ("The second counterclaim for contractual indemnification is moot given the above resolution of Trafalgar's claims.  Therefore, the counterclaims will be dismissed *sua sponte.*"); *Goodman v. Port Auth. of New York and New Jersey*, 850 F. Supp. 2d 363, 378–79 (S.D.N.Y. 2012) (dismissing the defendants' cross-claims for indemnification and contribution as moot where the plaintiff's claims that were the basis for the action had been dismissed); *Griffin v. Schwegmann Bros. Giant Supermarkets*, 542 So. 2d 710, 713 (La. Ct. App. 1989) ("Since we found that the plaintiff failed to prove his case and hence, there exists no liability on the part of the defendants, the issue of their indemnification is moot.").